LINUS B. COMINS *vs.* JAMES A. COE & another.

Suffolk. Nov. 18, 19, 1874. — Jan. 12, 1875. WELLS & DEVENS, JJ., absent.

A. sold to B. certain shares of stock in a corporation, and B paid for them by his check. The stock was transferred on the books of the corporation to the credit of B. but no certificate was issued. B. at this time had a large amount to his credit in the bank on which the check was drawn, and intended to buy the stock and pay for it. He had previously committed independent frauds, and, these being discovered before the check was paid, payment was refused by the bank and B. became bankrupt. A. then brought a bill in equity against B. and the corporation to compel a conveyance of the shares. *Held,* that it could not be maintained.

BILL IN EQUITY against James A. Coe and the Cary Improvement Company, to compel the conveyance to the plaintiff of 100 shares in the capital stock of the last named defendant, sold by the plaintiff to said Coe. Relief was sought on the ground that the sale was induced by fraud. Coe having become bankrupt, his assignees were admitted to defend. The case was heard before *Endicott,* J., who reported for the consideration of the full court the question whether the bill could be maintained upon the following findings of facts.

The plaintiff and the defendant Coe were both brokers, and had previously dealt in stocks with each other, the plaintiff having received Coe's checks in payment for stock sold, as he did in this case. Coe had been for more than a year borrowing large sums of money, giving to the lenders as collateral security certificates of stock which, originally issued for one or two shares, had been altered by him so as to appear certificates for one or two hundred shares. In May, 1873, at the time of the transaction hereafter described, he was indebted very largely to various persons who held these fraudulent certificates, and was deeply insolvent, though his credit was unimpaired, and until the discovery hereafter referred to, he had no expectation of not meeting his engagements in regular course. On May 12, Comins sold him one hundred shares in the capital stock of the Cary Improvement Company for $1337.50, to be delivered on the 13th. As a matter of convenience among brokers who are making constant transfers of stock, delivery of stock bought is made not by delivering a certificate, but by a simple transfer on the books of the corporation, and having the stock carried to the credit of the purchaser on those books; and in this way the stock was delivered to Coe on the 13th, Coe receiving no certificate. About a quarter before two o'clock on the 13th, the plaintiff went to Coe's office, and received from him a check for the price of the shares, drawn on the Massachusetts National Bank, telling him that he would at once transfer the stock to him. He left Coe's office, went to the office of the Cary Improvement Company, and there transferred to Coe the 100 shares on the books of the company, and these shares were thereupon placed to Coe's credit on those books. He then went to the First National Bank, where he deposited Coe's check, with other funds, to his own credit. The next day, between ten and eleven, it was returned to him by his bank as not good, and the plaintiff has received no other consideration for the transfer of the stock.

On the morning of May 13, at nine o'clock, there was standing to Coe's credit, on the books of the Massachusetts Bank, the sum of $51,727.26. During bank hours on that day he made deposits amounting to $26,471.60, making the sum of $78,198.86 available to meet his checks on that day. On the same day checks of his were paid by the bank to the amount of $34,829.50. This

amount includes one check for $20,000, which was presented to the bank between eleven and twelve o'clock, and was certified by it, the amount being, according to its custom, charged off then, and paid when the check was presented through the clearing-house the next day. About half-past one o'clock on the 13th, the Massachusetts Bank received an intimation that Coe had been using raised certificates. Upon examining those that they held as security for a demand loan which they had made Coe, and which had been standing about a month, and upon inquiry at the offices of the companies, the bank officers discovered that their certificates were fraudulent, and about two o'clock charged off on the books of the bank the amount of this loan, which, with interest, was $37,097.50, leaving a balance to his credit, when the bank closed, of $6262.86. The same afternoon, about three o'clock, the bank's discount clerk went to Coe's office and asked him for a check for the amount so charged off, which Coe gave. In the conversation that then occurred, Coe learned for the first time that his forgeries had been discovered, or that the bank wished to call in its loan. The next morning, between nine and ten o'clock, Coe deposited in the Massachusetts Bank a check for $8000, which was paid to the bank. At ten o'clock checks were presented, through the clearing-house, to the Massachusetts Bank for $11,505.25, among which was the check for $1337.50 given to the complainant Comins, and all these checks were returned by the Massachusetts Bank unpaid. The balance to the credit of Coe, on the 14th, when these checks were presented, was $14,005.19.

The bank afterwards charged off $62, on account of interest on its loan, which was omitted when the calculation was first made, leaving a balance still to his credit of $13,942.69. The evidence showed that the transaction was one in the ordinary course of business, and that Coe, when he drew the check which he gave to Comins, expected that it would be paid. The Massachusetts Bank declined to pay the checks presented on the 14th, because between nine and ten o'clock on the 14th its officers were informed by Mr. Ransom, the president of the North Bank, that one Nathan Matthews (but whether by authority from said Matthews or not did not appear) would claim to recover of them the value of a certificate for 200 shares in the capital stock of the

Boston & Albany Railroad Corporation, which Coe had given the bank as collateral for a loan to him, the certificate being made out to the bank. When the loan was paid, the cashier of the bank, in order to return his stock to Coe, signed the blank transfer on the back of the certificate. This certificate Coe afterwards gave Matthews as collateral for a loan, and Matthews claimed ·to hold the bank as indorsers of the certificate, which had been raised from two to two hundred shares, his claim being larger than the balance which still remains to Coe's credit. In a suit brought by Matthews to enforce this claim, the Circuit Court of the United States decided in favor of the plaintiff, and the case has been carried to the Supreme Court of the United States on appeal, where it is now pending.

Upon these facts, which were not disputed, the judge found that Coe, when he purchased the shares of the complainant, had no intent to defraud him, and that when he gave the check for $1337.50, he supposed that it would be paid, having funds enough in the bank to meet it after deducting the loan of the bank secured by fraudulent collateral.

*J. M. Keith*, for the plaintiff.

*D. Thaxter & M. Storey*, for the defendants.

MORTON, J. From the facts stated in the report, it is clear that there was a completed sale of the stock in question by the plaintiff to Coe. The plaintiff sold the stock, received Coe's check in payment therefor in the usual course of business, and transferred it to Coe upon the books of the company. This vested the title to the stock in Coe. The fact that no new certificate was issued by the company is immaterial.

The only ground upon which the plaintiff can obtain the relief he seeks is, that he has the right to rescind the sale because he was induced to make it by the fraudulent acts or representations of Coe. The bill alleges that Coe, intending to defraud the plaintiff, pretended that he desired to buy the stock, and that in pretended payment therefor, he delivered to the plaintiff his check upon the Massachusetts National Bank, " well knowing that he had no funds in said bank to meet said check."

But it was found by the justice who heard the case, that Coe, when he purchased the stock of the plaintiff, had no intent to defraud him, and that when he gave the check he supposed that

it would be paid, having funds enough in the bank to meet it. These findings negative the allegations of the bill, and show that there was no fraud in the transactions with the plaintiff which gives him the right to rescind the sale.

It further appeared at the hearing, that on the day when the plaintiff's check was given, it was discovered that Coe had previously committed several forgeries by altering certificates of stock. One of these forged certificates was held by the bank as collateral security for a loan to Coe, and upon discovering the forgery, the bank charged off the amount of this loan to Coe's account, who gave them a check therefor. But there was left a balance in favor of Coe sufficient to meet all the checks he had drawn. Another forged certificate made out to the bank had been previously held by the bank as collateral security, and the cashier, in order to return the stock to Coe, had signed a transfer in blank, on the back of the certificate. Upon learning that the present holder of this certificate claimed to hold the bank liable for its apparent value, the officers refused to pay any of the checks drawn by Coe. The plaintiff contends that these facts give him the right to rescind the sale, but we can see no principles of law upon which this claim can be. sustained. The previous forgeries by Coe were entirely independent transactions, having no connection with his purchase of the plaintiff. The fact that one of the incidental effects of their discovery was to prevent the plaintiff from obtaining payment of his check, does not taint such purchase with fraud. If it did, then all the creditors who sold goods to Coe after the forgeries, if prevented by their exposure from getting their pay, could avoid the sales and regain the goods if they remained in Coe's possession at the time of his bankruptcy. The fact that a man commits a crime or fraud, the exposure of which will destroy his credit and render him insolvent, and conceals it, cannot be held to make voidable every purchase which he makes upon credit, if made without fraud and in good faith.

As the plaintiff has failed to show the fraud which he charges, or any fraud which enters into and forms part of the purchase of the stock in question, we are of opinion that he is not entitled to a decree that the stock shall be conveyed to him, but that it belongs to the assignees of Coe, to be distributed among his creditors with his other property.     *Bill dismissed.*