WILLIAM H. GOODWIN & others *vs.* MASSACHUSETTS LOAN AND TRUST COMPANY & others.

Suffolk.   November 19, 20, 1889. — September 5, 1890.

Present: FIELD, C. J., DEVENS, W. ALLEN, & KNOWLTON, JJ.

*Collateral Security — Indorsement for Accommodation — Commissions — Cotton Futures — Fraud — Bona Fide Holder for Value — Payment by Check — Interest — Costs — Counsel Fees.*

A debtor pledged to his creditor as collateral security for his indebtedness his promissory note, indorsed for his accommodation as the creditor knew, and also a draft drawn by the debtor on a person indebted to him, who accepted the draft on account of the debt. The acceptor, when the draft became due, delivered to the pledgee in payment thereof certain securities. *Held,* that the whole proceeds of these securities must be applied by the pledgee to the payment of the debt of his debtor before property of the accommodation indorser which had come into the pledgee's hands could be used for that purpose.

A trust company taking goods in pledge for advances was, by agreement, to charge stipulated commissions upon sales made by it in case of the pledgor's default. The pledgor failed, and thereafter without compensation negotiated sales of the goods; but the goods were sold under the supervision of the company's managing officer, at prices approved by him and paid to it, the bills being rendered in its name. In previous like transactions between them, when the pledgor was solvent, the company had allowed him to sell the goods, and had charged no commissions. *Held*, that a finding was warranted that the trust company was entitled to commissions on the sales made after the pledgor's failure.

A pledgee of goods from the consignee thereof, who at the latter's request pays drafts drawn for advances on the same, with knowledge that the consignee was not authorized to pledge the goods for any loans beyond the amount of the advances, is not protected by the Pub. Sts. c. 71, § 4.

If goods consigned to a commission merchant for sale are pledged by him to a trust company, which pays the consignor's drafts drawn upon the consignee for advances on the goods, the pledgee, upon the failure of the consignee and a sale of the goods under its supervision, is entitled to the usual charges of commission merchants as against the consignor.

A pledgee of cotton from the consignee thereof, who pays advances thereon to the consignor, is not entitled to charge against the latter losses upon sales and purchases on "futures" against the cotton which were negotiated by him and the consignee without the consignor's knowledge and consent.

A pledgee of cotton, who, after the pledgor's failure, with his consent and with that of the indorser of collateral security supplied by him, in order to protect the parties in interest against a decline in the market price of cotton, sells "futures" against the pledge, intending to use the pledge in making deliveries under such sale, and then sells the cotton elsewhere for the purpose of greater profit, and purchases "futures" against those previously sold, whereby a higher price is obtained for the pledge than was obtainable immediately after the pledgor's failure, should, if charged with the amount actually received, be also credited with the amount expended in the purchase of "futures."

If chattels are pledged merely to secure a pre-existing debt, the pledgee is not a holder for value.

Goods were sold under an agreement by which the purchaser was not to have possession until he made full payment. Some three weeks after, he made a partial payment of the agreed price, and received possession upon giving his check for the balance, having at the time no distinct belief that the check would or would not be paid, and having no reason to believe that it would be paid, but the contrary. His failure occurred before the check was presented in the regular course of business through the clearing-house, and at the time of such presentation the purchaser had already pledged the goods to one of his creditors for a pre-existing debt, without any other consideration. *Held*, that the seller was entitled, in equity, upon surrendering the check, to have the amount thereof paid to him from the proceeds of the goods realized by the pledgee.

Upon a bill in equity to determine the title to goods pledged to secure loans and advances, to which there were different claimants, it appeared that the pledgee, who was a defendant, and an active litigant in the case, had had the use of the money accruing from sales of the goods. He was defeated on some of his claims, and the litigation was in part caused by his misconduct. *Held*, that he was liable for interest upon the sums due to the different claimants from the dates they became due, and was not entitled to have his costs and counsel fees paid out of the fund.

BILL IN EQUITY, brought by the assignees of Robert Scott under an assignment for the benefit of his creditors, against the defendant trust company, the members of the firm of Manning and Sears and its assignees under a like assignment, John H. Clisby, Robert Scott, and the members of the firms of Walter T. Miller and Company and of Thayer, Brigham, and Company, to recover the surplus proceeds of certain cotton pledged to the trust company as collateral security for advances. Hearing before *Devens*, J., who reserved the case upon the pleadings, the master's report, and exceptions thereto, for the consideration of the full court. The material facts appear in the opinion.

*E. W. Hutchins*, for the plaintiffs.

*H. D. Hyde & S. Williston*, for the trust company.

*C. H. Fiske*, for Clisby.

*M. M. Weston*, for Thayer, Brigham, and Company.

FIELD, C. J. Robert Scott and the firm of Manning and Sears both failed on March 30, 1878, being at that time largely indebted to the trust company for advances. Before these failures respectively, Scott had pledged 719 bales of cotton to the trust company to secure his indebtedness, and Manning and Sears had to secure their indebtedness pledged to it 3,314 bales of cotton, besides their promissory note for $20,000, indorsed by Scott "waiving demand and notice," and their draft for $9,000 on Miller and Company, accepted by that firm. The latter firm took up this acceptance by depositing with the trust company certain securities. Fifty bales of the cotton pledged by Manning and Sears were bought by that firm, their check being given in payment, of Thayer, Brigham, and Company, and upon the non-payment of this check the latter firm replevied the cotton and sold it, but paid over the proceeds to the trust company, claiming an equitable lien thereon for the amount of the check. Of the 3,264 bales of cotton remaining, 341 bales were consigned to Manning and Sears, for sale, by Clisby, whose drafts on them for advances were paid by the trust company. Scott's cotton was sold, and the proceeds above the advances to him, deducting commissions at two and a half per cent charged by the trust company on the sales, amounted to $8,149.63, which amount the trust company applied upon said note of $20,000. The Manning and Sears cotton, including the fifty bales above mentioned, was

sold for an amount insufficient to pay the indebtedness of that firm to the trust company; but the proceeds of the sale, together with the amount of the acceptance of Miller and Company and the above balance on Scott's account, were more than enough to satisfy such indebtedness, and there was left a balance in the hands of the trust company. The master found that Clisby was entitled to recover from the trust company the proceeds of the cotton consigned by him to Manning and Sears, after deducting their advances and charges; that Thayer, Brigham, and Company, upon surrender of the check, were entitled to the amount thereof; that the trust company was entitled to its commissions at two and one half per cent on the sales of all the cotton pledged to it; that the indorsement of Scott was for accommodation only; that the acceptance of Miller and Company was not for accommodation; that the securities deposited in taking up the acceptance should be applied towards the payment of the indebtedness of Manning and Sears before resort could be had to the $8,149.63, being the balance of the proceeds of Scott's cotton; that the plaintiffs were entitled to so much of the above sum of $8,149.63 as had been wrongfully applied by the trust company upon the $20,000 note; and that on the facts hereinafter stated the trust company was entitled to retain out of the balance remaining in its possession certain amounts paid out by it on account of sales of " cotton futures."

The finding that Scott was an accommodation indorser on Manning and Sears's note for $20,000, as well as the finding that the acceptance by Miller and Company of the draft for $9,000 was not an accommodation acceptance, are warranted by the special facts relating thereto, which the master has reported. The master has also found that the trust company knew that Scott was an accommodation indorser on the note. The ruling on these findings, therefore, is correct; namely, that the proceeds of the draft, " and the property substituted therefor, must be held and applied to the payment of any deficit in the account of the Massachusetts Loan and Trust Company with Manning and Sears, before calling on Robert Scott to make up any such deficit." *Guild* v. *Butler,* 127 Mass. 386.

The master has reported the facts with regard to the manner in which the sales were made of the cotton pledged by Scott, and

by Manning and Sears, and has found that the trust company is entitled to "charge the stipulated commission of two and a half per cent on all sales of said cotton." The contention is, that, as Scott and Manning and Sears were employed to negotiate the sales which were made, and rendered their services without compensation, and as before the failure of Scott and of Manning and Sears the trust company had permitted them to make sales of other cotton pledged for previous loans, and had charged no commissions, none should be charged in this case. The original agreements of the parties, made when the cotton was pledged, authorized the trust company, in case of default in the payment of the loans, to sell the cotton at public or private sale without demand or notice; and it was stipulated that "the commissions of the said company upon a sale of the said merchandise shall be two and a half per cent upon its gross proceeds, if sold for cash," etc. The master has found that the cotton was sold "under the supervision of the managing officer of said company, at prices approved by him, that bills of sale were at all times rendered in the name of the company, and that payments in all cases were made to it of the precise amount of each sale." This is, in effect, a finding that the sales were made by the company, although they were negotiated by Manning and Sears and by Scott. It was a question of fact whether the stipulation in the agreements for a commission on the sales had been waived by the company, or whether it was agreed between the company and Manning and Sears and Scott that no commissions, under the circumstances, should be charged by the company. The previous transactions, in which Manning and Sears and Scott, when solvent, had been permitted to sell for the company other cotton which they had pledged, were, at most, only evidence upon these questions, and the circumstances under which the other sales had been made, and the manner of making them, differed in important respects from the facts shown in this case. We see no error in the finding of the master, that the company is entitled to charge commissions.

The defendant Clisby consigned to Manning and Sears, for sale, 341 bales of cotton, and drew on them on account of this consignment, three drafts, in all amounting to $13,640, "which drafts were paid by the Massachusetts Loan and Trust Com-

pany, or with money furnished by it at the request of Manning and Sears for the purpose of paying them, and with knowledge on the part of said company that said cotton was so consigned for sale, and that said drafts were drawn for advances on the same." The bills of lading of this cotton were transferred, and the cotton was pledged to the trust company by Manning and Sears as security for loans made to them. No authority was given by Clisby to Manning and Sears to pledge this cotton as security for the payment of debts due from them to other persons in other transactions. It is plain, therefore, that they had no authority to pledge it as security for anything more than the amount of their advances to Clisby, and that the trust company, on the findings of the master, must be taken to have known this. The pledge is not protected by the Pub. Sts. c. 71, § 4. The trust company, according to the facts found by the master, had not probable cause to believe that Manning and Sears had authority to pledge this cotton for any loans beyond the amount of their advances to Clisby. So far as the pledge was intended as security for additional loans, it was an attempt to pledge Clisby's property for the sole benefit of Manning and Sears; and as this was done without the authority of Clisby, it was in fraud of his rights. *Donald* v. *Suckling,* L. R. 1 Q. B. 585. *Innerarity* v. *Merchants' National Bank,* 139 Mass. 332. *Talty* v. *Freedman's Savings and Trust Co.* 93 U. S. 321. It was the duty of the trust company to keep the Clisby cotton separate from the other cotton pledged by Manning and Sears, and when they sold it, to keep the proceeds separate; but as they have not done so, the proceeds of the Clisby cotton must be separated from the rest of the account as accurately as is possible. We see no reason why the usual charges of commission merchants, such as Manning and Sears would have been entitled to charge against Clisby, should not be allowed the trust company on this cotton, and these the master has allowed. The sales and purchases of futures in cotton were made without the knowledge of Clisby, and were never assented to by him. It has not been found that such sales and purchases were authorized by any custom or usage, even if any such custom or usage would be legal, and the losses occasioned by these sales and purchases were rightly disallowed in the account of the trust company with Clisby.

A more difficult question in the case is the effect of the dealing by the trust company in cotton futures, the particulars of which are set forth below, upon the account which is to be taken with Manning and Sears and with Scott. It has been held that sales and purchases of such futures, with no intention to deliver or to receive delivery of the merchandise, but with an intention to set off the purchases and sales against each other, and to settle them by the payment of differences, are illegal and void by the common law of Massachusetts, and that parties who knowingly promote such sales and purchases, and advance money on account of them, cannot recover their advances. *Harvey* v. *Merrill*, 150 Mass. 1. It would seem to follow from this, that, if Manning and Sears and the trust company engaged in such illegal transactions, neither party could maintain a suit against the other to recover any share of the profits received or the losses paid. See *Snell* v. *Dwight*, 120 Mass. 9; *Dunham* v. *Presby*, 120 Mass. 285.

The master finds that "the course pursued by the Massachusetts Loan and Trust Company in selling and buying 'futures' was known and assented to at the time by Manning and Sears, and by Walter T. Miller and Company, through whom the purchases and sales of 'futures' were in great part made." On the day of the failure of Scott and of Manning and Sears, the trust company held 719 bales of cotton pledged by Scott, and 3,314 bales pledged by Manning and Sears. Thayer, Brigham, and Company immediately replevied fifty bales from the cotton pledged by Manning and Sears, and sold them, and paid over the proceeds to the trust company, and the master's report states that "it was conceded by all parties to the suit that the proceeds of the sale of said cotton should be treated as if the same had been sold by said company without regard to said replevin suit." The trust company, therefore, found itself immediately after the failure of Manning and Sears in possession of 3,264 bales of cotton pledged by them, and of this it sold prior to April 15, 1878, 226 bales, leaving 3,038 on hand. As recited in the master's report, "The weight of these 3,038 bales was equivalent to 3,264 bales of 450 pounds each, the standard weight required by the rules of the New York Cotton Exchange; . . . and the 341 bales of Clisby cotton were equivalent to 380 bales

of 450 pounds each." Between April 15 and April 25, 1878, the trust company sold on the New York Cotton Exchange "cotton futures" to the amount of 3,300 bales of 450 pounds each, "deliverable, 1,500 bales in July, and 1,800 in August." After this the price of cotton advanced, and the trust company from April 25 to November 12, 1878, actually sold in Boston all this cotton in different parcels for cash, and delivered it there to the purchasers, and the company has credited Manning and Sears with the actual amounts received. In order to meet its sales of cotton futures, amounting to 3,300 bales, the trust company bought on the New York Cotton Exchange, in May, June, July, and August, 1878, "cotton futures" of corresponding amounts, and used them by way of set-off in settlement of the sales of futures which it had previously made. These sales and purchases of futures resulted in a loss of $6,925.51. The contention of the trust company is, that the sales of cotton futures were originally made to protect itself and Manning and Sears from a further decline in the price of cotton, with the intention of using the cotton on hand in making deliveries under these contracts, and that, instead of shipping the cotton to New York and delivering it in performance of these contracts, it was more profitable to sell and deliver the cotton in Boston, and to purchase cotton futures in New York to be set off against the sales of cotton futures which it had made. With regard to this dealing in cotton futures the master finds as follows : " I further find that the sales of 'futures' made by said company were originally made in good faith, at the suggestion of Manning and Sears, and for the purpose of avoiding a loss by immediate cash sales which might reasonably be expected to depress the market, and to secure the company and Manning and Sears, and all parties in interest, against a decline in price, by which the security of the company upon said cotton might be impaired, and the claim against Manning and Sears and against the other securities increased. And I find that the course pursued in fact realized a larger sum from sales of said cotton towards the payment of the debt of Manning and Sears than would have resulted from the immediate sale thereof for cash in the market at Boston at the time of the failure of Manning and Sears."

On these findings, we think that it must be considered that

the original sales of cotton futures were intended to be sales on account of the cotton then in the possession of the trust company, and that it was intended that the cotton should be delivered in pursuance of these sales unless some other arrangement should be made thereafterwards, and that the master has in effect found that the sales were legal contracts.   The purchase of cotton futures was a device for the settlement of the sales of futures which had been made; standing alone, the inference might be that the purchases were illegal.   But the purchases, with the payment of the differences, were the means of cancelling the contracts of sale for future delivery by which the trust company was bound.   It does not appear that if, instead of selling the cotton in Boston, as it was sold, and of settling the sales which had been made of cotton futures in the manner in which they were settled, the cotton had been actually transported to New York and delivered there, in performance of these contracts of sale, the net receipts would have been greater than they actually were.   None of the parties has asked that the trust company be required to account for the cotton at the prices obtained by the sales of futures; they ask that the trust company be charged with the higher prices obtained in Boston, and that it should not be credited with what it was compelled to pay in discharge of the contracts of sale which it had made in New York. We think that on the master's findings his conclusion is correct, which is, that if the trust company is to be charged with the prices actually obtained for the cotton in Boston, it is entitled to be credited with the expenditures incurred in discharging the sales of futures which it had made against the cotton, so far as the parties are concerned who advised or assented to this manner of doing business.   Manning and Sears and Miller and Company both advised and assented to it.   The master has also reported the evidence pertaining to Scott's knowledge, or want of knowledge, of the purchases and sales of cotton futures on account of the Manning and Sears cotton.   We have read this evidence, and think that it supports the findings of the master; and indeed we think that the master might have found that Scott assented to these purchases and sales, and we so find as a fact. The method of proportion employed by the master to ascertain the amount of the loss resulting from the dealing in futures

which should be debited to the cotton of Manning and Sears, seems to us correct. There was no other practicable way of determining this amount than by the rule of proportion.

The finding that the trust company had in its possession, when it sold and purchased the cotton futures, 2,884 bales of 450 pounds each, is ascertained by deducting from all the cotton pledged by Manning and Sears the amount of the Clisby cotton, and the fifty bales which had been replevied by Thayer, Brigham, and Company. As sales on the Cotton Exchange must be in multiples of one hundred, only 2800 bales of this cotton could be sold on the Exchange. All sales beyond this were either unauthorized, as in the case of the Clisby cotton, or were, in part at least, on speculation, as it does not appear that the trust company had cotton enough to make the deliveries required. Losses from speculation in other cotton, or in no cotton at all, ought not to be brought into the account, certainly not as against Scott, who did not know the details of the sales and purchases of cotton futures, although he did know that sales and purchases of cotton futures were made against the cotton of Manning and Sears. The master's ruling in this respect is affirmed.

If Manning and Sears obtained the fifty bales of cotton of Thayer, Brigham, and Company under such circumstances that Thayer, Brigham, and Company would be entitled to reclaim it from them, yet, as the trust company has realized from the security given by Manning and Sears more than enough to pay their indebtedness and the claim of Thayer, Brigham, and Company, it would not be necessary to consider whether the trust company was a *bona fide* holder for value of these fifty bales, except for the claim of the assignees of Scott. But Scott's position is essentially that of a surety of Manning and Sears, and if the pledge of these fifty bales was a valid pledge of Manning and Sears's property, it must first be applied to the payment of their indebtedness before Scott can be called upon to pay anything. The first question, therefore, is whether the trust company is a *bona fide* holder for value of these fifty bales, within the meaning of the rule that a vendor cannot reclaim property which has been obtained from him by fraud, if the vendee has delivered it to a *bona fide* purchaser for value who had no

knowledge of the fraud. The master finds, in effect, that this cotton was delivered by Manning and Sears to the trust company as security for a pre-existing debt. It is not found that it was delivered in payment of any debt, or that the trust company, in consideration of the pledge, made any contract to extend the time of payment of any debt, and it is found that the trust company did not make any loan or advance of money upon the faith of this pledge.

In this Commonwealth, it is held that taking a negotiable promissory note before maturity as security for a pre-existing debt, is a taking for value, and that any equities which may exist between the maker and the person from whom it is taken cannot be set up against such a holder, if he took the note in good faith, and without knowledge of these equities. In this respect, the law here differs from that of New York and of some other States. *Blanchard* v. *Stevens*, 3 Cush. 162. *Stoddard* v. *Kimball*, 6 Cush. 469. *Culver* v. *Benedict*, 13 Gray, 7. *Le Breton* v. *Peirce*, 2 Allen, 8. *Fisher* v. *Fisher*, 98 Mass. 303. See *Ives* v. *Farmers' Bank*, 2 Allen, 236; *Railroad Co.* v. *National Bank*, 102 U. S. 14; *Bank of the Republic* v. *Carrington*, 5 R. I. 515; *Currie* v. *Misa*, L. R. 10 Ex. 153, and 1 App. Cas. 554. Whether a similar rule applies to a pledge of chattels by a vendee as security for a pre-existing debt when the original vendor attempts to rescind the sale for fraud, does not appear to be clearly established. It seems to be settled in the case of chattels, that an attaching creditor, or an assignee in insolvency or bankruptcy, is not a purchaser for value within the meaning of the rule, and this is probably true of an assignee for creditors under an assignment executed by the debtor. *Buffington* v. *Gerrish*, 15 Mass. 156. *Clark* v. *Flint*, 22 Pick. 231. *Bussing* v. *Rice*, 2 Cush. 48. *Wiggin* v. *Day*, 9 Gray, 97. *Donaldson* v. *Farwell*, 93 U. S. 631.

Whatever may be the law in the case of a transfer of chattels in payment of a pre-existing debt, when the debt is thereby discharged, we think that by the weight of authority a pledging of chattels as security for a pre-existing debt, when there is no present consideration whatever for the pledge, does not constitute the pledgee a holder for value, within the meaning of the rule we are considering, and that the ruling of the master is

correct.    The cases are largely collected in the notes to 2 Pom.
Eq. Jur. § 749.    See also *Loeb* v. *Peters*, 63 Ala. 243; *Wert* v.
*Naylor*, 93 Ind. 431; *Sleeper* v. *Davis*, 64 N. H. 59; *Linnard's
appeal* (Pa.), 3 Atl. Rep. 340; *Merchants' Ins. Co.* v. *Abbott*,
131 Mass. 397, 400; *Lesassier* v. *The Southwestern*, 2 Woods,
35; *Currie* v. *Misa*, L. R. 10 Ex. 153; *Leask* v. *Scott*, 2 Q. B.
D. 376; *Rodger* v. *Comptoir d'Escompte de Paris*, L. R. 2 P. C.
393; *Chartered Bank of India* v. *Henderson*, L. R. 5 P. C. 501.

The next question is whether Thayer, Brigham, and Company
had the right to reclaim the cotton.    From the finding of the
master, it appears, we think, that the title to the cotton passed
to Manning and Sears at the time of the purchase.    The original
credit was for thirty days, with interest at seven per cent after
ten days, the sellers agreeing to store and insure the cotton for
thirty days.    It is found that, " after the expiration of thirty
days, it was arranged that Manning and Sears should continue to
pay interest at seven per cent, and storage and insurance; that
the full price of the cotton should be paid on demand, and that
any part of the cotton taken from storage should be paid for
when taken."    On March 4, 1878, Manning and Sears paid
$2,000 on account, and on March 30, 1878, they obtained posses-
sion of the cotton by paying $16 in money and by giving their
check for $1,341.50.    Thayer, Brigham, and Company parted
with the possession of the cotton, and thus lost their lien upon
it, on the faith that this check would be paid.    The attempt of
Thayer, Brigham, and Company is not to rescind the sale of the
cotton, but to rescind the transaction whereby the possession of
the cotton was delivered to Manning and Sears.    The finding of
the master upon the intent of Manning and Sears in giving the
check is as follows: " I find, upon all the evidence bearing upon
the question, that at the moment of giving said check and procur-
ing the delivery of said cotton from Thayer, Brigham, and Com-
pany, Manning and Sears had no deliberate intention to defraud
Thayer, Brigham, and Company, and no distinct intent or be-
lief that said check should or would not be paid; but I find
that they knew that they were insolvent, and that they might
and probably would fail on that day; and that they had no rea-
son to believe that said check, if presented in the ordinary course
of business through the clearing-house on Monday, would be paid,

but had reason to believe to the contrary." At the request of some of the parties, the master has reported the evidence bearing upon the intent of Manning and Sears in giving to Thayer, Brigham, and Company their check for $1,341.50, and thereby obtaining a delivery of the fifty bales of cotton. We have read this evidence, and think that it warrants the findings of the master on this part of the case.

The use of checks in making payments is very common, and they are ordinarily received as equivalent to money; usually, they are received as conditional payment. The giving of a check in payment, without anything more, must be taken to be a representation on the part of the person who gives it that he believes that it will be paid when presented in the ordinary course of business, and the collection of a check in Boston through the clearing-house is according to the usual course of business among merchants. See *Taylor* v. *Wilson*, 11 Met. 44, 51. It is manifest that Manning and Sears, not having requested Thayer, Brigham, and Company to present the check on Saturday, or given them any warning whatever that the check if presented on Monday would probably not be paid, had reason to believe that the check would be presented through the clearing-house on Monday. The finding of the master, therefore, amounts to this : that Manning and Sears had no distinct belief that the check would or would not be paid, — that they had no reason to believe that it would be paid, but had reason to believe the contrary. It does not seem to have been much considered in this Commonwealth whether the misrepresentation on account of which a contract can be rescinded must be in all respects the same as that on which an action for deceit can be maintained, although in England and in many of the States of this country a clear distinction has been taken between the two. *Derry* v. *Peek*, 14 App. Cas. 337, 359. 1 Bigelow on Fraud, 414. Pollock, Con. (Wald's ed.) cc. 9, 10. It has indeed been said, in *King* v. *Eagle Mills*, 10 Allen, 548, 551 : " There can be no doubt that a vendee may rescind a contract for the sale of chattels, and refuse to receive or accept them, if the vendor has been guilty of deceit in inducing the former to enter into the bargain. But to maintain a defence to an action for the price of goods on this ground, the same facts must be proved which would be

necessary to maintain an action for damages for deceit in the sale of goods." See also *Bierce* v. *Stocking*, 11 Gray, 174, 178.

Our law in actions of deceit is perhaps not precisely that declared by the House of Lords in *Derry* v. *Peek, ubi supra*, (see *Chatham Furnace Co.* v. *Moffatt*, 147 Mass. 403,) and it may deserve consideration hereafter whether a contract cannot be rescinded for a misrepresentation or a concealment. of facts which would not support an action of deceit. In *Comins* v. *Coe*, 117 Mass. 45, it was found as a fact that Coe when he gave the check " supposed that it would be paid, having funds enough in the bank to meet it after deducting the loan of the bank secured by fraudulent collateral," and this was plainly a reasonable supposition under the circumstances there shown. The contention in the present case is, that, as the master has not found that Manning and Sears had actually a distinct belief that the check would not be paid, there is no fraud, although they did not have a distinct belief that it would be paid, and " had reason to believe to the contrary." It concerns the safety of mercantile transactions that the delivery of the possession of merchandise should not be considered as irrevocable when it is procured by paying the price with a check given under the circumstances shown in this case, and with the knowledge which, on the findings of the master, the drawers of the check had of their insolvency, and the belief, or the want of belief, which they had concerning the probability of the check's being paid. Whether this should be put upon the ground of a concealment of material facts, which under the circumstances Manning and Sears ought to have disclosed, or on the ground that the delivery of the check as money was of itself a representation that it was good and would be paid, and that this representation was in fact false, and that Manning and Sears did not actually believe the representation to be true, it is not material now to determine. For the purpose of rescinding mercantile transactions, the distinction between not believing that a check would be paid, and believing that it would not be paid, is too refined for practical use, and the conduct of Manning and Sears, if not intentionally fraudulent, was reckless, and likely to mislead, and Thayer, Brigham, and Company were actually misled by it. As this is a proceeding in equity to establish an equitable lien

to the extent of the amount of the check, it is a sufficient restitution on the part of Thayer, Brigham, and Company if the check be cancelled and filed in court before the decree is entered. We affirm the rulings of the master upon this part of the case.

The master has charged the trust company with interest on the sums due to the various claimants, and this, we think, is correct. The trust company has had the use of the money; it has been an active litigant in the case, and has been defeated in some of its claims; and the litigation has been occasioned in part by its conduct in mingling the Clisby cotton with the rest, and in dealing indiscriminately in cotton futures. Its prayer to have its costs and counsel fees paid out of the fund is refused. A decree must be entered in accordance with the findings of the master, the interest to be computed up to the date of the decree. The details of the decree may be settled by a single justice.

. *So ordered.*