**SECOND NAT. BANK OF HOBOKEN, N. J., v. McGEHEE et al. (No. 6263.)**

(Court of Civil Appeals of Texas. Austin. Feb. 22, 1922. Rehearing Denied May 18, 1922.)

1. **Appeal and error ⬮1050(2)—Erroneous evidence on issue not necessary, for decision is not prejudicial.**

The erroneous admission of evidence on behalf of defendants is not prejudicial to plaintiff where its only tendency was to establish a fact which was not essential to sustain the defense relied on by defendant.

2. **Bills and notes ⬮334—Requirement innocent holder shall set off debt against fraudulent indorser on learning of fraud does not depend upon conspiracy.**

The requirement that the innocent purchaser of a negotiable instrument, who owes a debt to his indorser, who obtained the instrument by fraud, shall, on discovery of the fraud, offset the indorser's liability against the debt and return the paper to the indorser, rather than use the protection given an innocent purchaser to compel the defrauded party to the instrument to pay it, does not depend upon the existence of a conspiracy between the holder and the indorser to compel the defrauded party to pay the instrument.

3. **Damages ⬮40(1)—Lost profits can be recovered where only amount is uncertain.**

The rule that damages which are based purely on speculation cannot be recovered does not prevent a recovery of the profits a party would have made except for fraudulent representations by the other party where there was no uncertainty that some damages were suffered; the only uncertainty being as to the amount.

On Rehearing.

4. **Courts ⬮107—Decision of Supreme Court held construction of statute binding on appellate court.**

The decision of the Supreme Court that an innocent holder of a note, who had on deposit, after he learned of the fraud whereby his indorser procured the note, funds belonging to the indorser sufficient to meet the note, must apply those funds to the payment of the note, and not rely on the protection given an inno-

cent holder to compel the defrauded maker to pay the note, was a decision that Rev. St. 1911, art. 582, providing that an innocent assignee for value shall be compelled to allow only just discounts against himself, did not prevent such a requirement of the innocent holder, though that statute was not mentioned in the Supreme Court opinion, where it was cited in the briefs and in the motion for rehearing, and that decision of the Supreme Court will be followed by the Court of Civil Appeals.

5. **Bills and notes ⬮365(1)—Statute allowing just discounts against holder allows equitable claims.**

The provision of Rev. Civ. St. 1911, art. 582, that an innocent purchaser for value shall be compelled to allow only just discounts against himself, permits charging him with just claims in equity as well as in law against himself.

6. **Bills and notes ⬮334—Equity does not permit innocent holder to disregard set-off against fraudulent indorser.**

Equity does not permit the innocent holder of a negotiable instrument to use the shield given for his protection by the law for the protection of his indorser, who procured the note by fraud, and therefore does not permit him, on learning of the claim of fraud, to disregard his right to offset his claim against the indorser against a debt due the indorser for money deposited with the holder, and thereby enable the indorser to reap benefit of his fraud.

7. **Bills and notes ⬮334—Reasonable restrictions on circulation of commercial paper are recognized.**

The fact that the rule requiring an innocent holder, after acquiring notice of his indorser's fraud, to offset against the indorser's liability his indebtedness to the indorser, rather than to recover from the defrauded maker, restricts to some extent the circulation of commercial paper, does not defeat the rule, since there are other valid rules imposing reasonable restrictions on the circulation of such paper.

8. **Bills and notes ⬮334—Maker cannot compel holder to resort to set-off against indorser without proving fraud.**

The maker of a note cannot compel an innocent purchaser thereof to resort to the indorser by offsetting against the indorser's liability a debt due from the holder to the indorser, unless the maker establishes fraud, want of consideration, or some other valid defense against the indorser.

9. **Bills and notes ⬮334—Requirement innocent holder shall have recourse against fraudulent indorser does not apply if circumstances make it inequitable.**

The rule that an innocent holder of a note, who thereafter acquires notice that it was obtained by his indorser's fraud, shall have recourse against his indorser if the latter has on deposit with the holder sufficient money to meet the indorser's liability, is a rule of equity which will not be applied where the circumstances render its application inequitable.

---

⬮For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**10. Bills and notes ⟨key⟩267—Rights and obligations of indorser are not identical with those of sureties.**

The rights and obligations of indorsers of commercial paper are not identical with the rights and obligations of sureties.

Key, C. J., dissenting.

Appeal from District Court, McLennan County; Erwin J. Clark, Judge.

Action by the Second National Bank of Hoboken, N. J., against George S. McGehee and others. Judgment for plaintiff for less than amount claimed and it appeals. Affirmed.

Scott & Ross and John McGlasson, all of Waco, for appellant.

Alva Bryan and Witt, Terrell & Witt, all of Waco, for appellees.

### Findings of Fact.

BRADY, J. Appellant, a banking corporation, domiciled at Hoboken, N. J., sued appellees upon a negotiable promissory note executed by them, and acquired by the bank in due course of business before maturity, for a valuable consideration, and without notice of any claims or equities against the same.

Appellees alleged that the note was executed for goods purchased from the Delion Tire & Rubber Company, Inc., of Trenton, N. J. It was also alleged that the contract for the sale of the goods was in writing, and that it contained certain guaranties, but that the goods had proven not to be as represented and as warranted, by reason of which appellees had been damaged in a sum largely in excess of the note sued on; that after the maturity of the note the original payee, Delion Tire & Rubber Company, which had indorsed the note to appellant, had on deposit at such bank at various times sums of money sufficient to pay off and discharge the note, but that the bank, upon notice of appellees' refusal to pay the note at maturity, and that they had defenses to the note, refused to apply the money so deposited to the payment and discharge of the note, which it was their legal and equitable duty to do. It was further alleged that appellant conspired with the indorser to unjustly defraud appellees and to compel them to pay the note by pursuing the makers in the state of Texas, instead of discharging the note with the deposits at hand, and returning the paper to the indorser; that such conspiracy was for the purpose of preventing appellees from asserting their just and lawful defenses, which were well known to appellant, and that the suit was brought for the benefit of such indorser, which had entered into an agreement with the bank to indemnify it against loss in the bringing of the suit.

At the conclusion of the evidence appellees, by formal admission under the rules, conceded that appellant had a good cause of action as set forth in its petition, except so far as such cause of action might be defeated, in whole or in part, by the defenses pleaded and proven on the trial.

The case was submitted to the jury upon special issues. Upon the undisputed facts of record and the findings of the trial judge and the jury, we make the following conclusions of fact:

Appellant acquired the note before maturity for value, and without notice of any defenses against it, but shortly after maturity, and before the filing of the suit, it had knowledge or was put upon inquiry of the defenses afterwards asserted in the suit. The goods which furnished the consideration for the note were not reasonably calculated to answer the purposes for which they were purchased. The guaranty in the contract between the Tire & Rubber Company and appellees was, according to the intention of the parties, to be construed as contended for by appellees; and the condition of the tires was not known to appellees before the execution of the note. The reasonable market value of the tires in the possession of the defendants at the maturity of the note was 50 per cent. of the net invoice price. The expenses incurred by appellees in attempting to market the Delion tires was $6,500. They abandoned any effort to place such tires on the market about May 18, 1918, which was the date the note matured. The net profits which appellees would have made on the contract in the sale of Delion tires for the full period of the contract, provided they had been of good material and workmanship, and up to the guaranties of the contract, was $50,000. The reasonable market value of the tires on hand and in the possession of appellees on June 17, 1918, was $6,650. The amount of the principal, interest, and attorney's fees of the note sued on, at the date of the trial, was $19,593.90. The amount of the deposits to the credit of Delion Tire & Rubber Company in the Second National Bank of Hoboken, appellant, at the date of the trial, was $19,503.88. The note was protested at maturity by appellant, and the liability of the indorser thereby fixed.

The jury also made the express finding that there was an understanding and agreement between the bank and the Tire & Rubber Company that the latter was to pay off or indemnify the bank against all loss and expenses that might be suffered by the bank in attempting to collect the note. We do not adopt this finding, because it is apparently dependent entirely upon evidence which may be hearsay, and therefore incompetent— a question which we have preferred not to decide, as will be hereinafter indicated.

The court rendered judgment in favor of the bank against appellees for the sum of

$90.02 with interest, such sum being the difference between the full amount due on the note at such date and the amount of the deposits to the credit of the Tire & Rubber Company, and in the hands of the bank. From this judgment the bank has appealed.

## Opinion.

The principal question here is whether this case is ruled by Van Winkle Gin Co. v. Citizens' Bank of Buffalo, 89 Tex. 147, 33 S. W. 862, and other cases following that decision, among which are Templeman v. Hutchings et al., 24 Tex. Civ. App. 1, 57 S. W. 868; State Bank v. Blakey & Co., 35 Tex. Civ. App. 87, 79 S, W. 331; Sperlin v. Peninsula Loan & Discount Co. (Tex. Civ. App.) 103 S. W. 232; Union Nat. Bank v. Menefee, 63 Tex. Civ. App. 599, 134 S. W. 822; Commercial Security Co. v. Collins (Tex. Civ. App.) 208 S. W. 728; Simmons v. Hodges, 250 Fed. 424, 162 C. C. A. 494. The doctrine announced and applied in these cases is tersely stated in the syllabus to Bank v. Menefee, supra, as follows:

"Where a nonresident indorsee of a note, after learning of fraud in the acceptance and negotiation of the note, had in its hands funds of the nonresident payee sufficient to pay the note, the maker is not liable to the indorsee."

The principles upon which the doctrine rests, and the reasoning upon which the conclusion is founded, are well indicated by the following excerpts from the opinion of Mr. Justice Denman, speaking for our Supreme Court in the Van Winkle Gin Co. Case:

"In order to determine whether the Van Winkle Gin & Machinery Company have the right in equity to have the amount deposited to the credit of the Forge Company in the plaintiff bank offset against the bill of exchange sued on, it will be necessary to examine and determine the nature of the contract of indorsement and the rights of the bank in reference thereto, as well as its relation to its depositors, as far as they affect the question under discussion.

"By its indorsement the Buffalo Forge Company in effect contracted that if when duly presented said bill was not paid by the acceptor it, the indorser, would, upon due and reasonable notice being given of the dishonor, pay the same to the indorsee bank; and the subsequent presentment and protest fixed its liability upon said contract of indorsement to pay to the bank immediately the amount of said bill and costs of protest. This is an independent and complete contract on the part of the indorser to pay to the indorsee said sums, and the bank was under no obligation whatever to such indorser to leave the state of their respective domiciles and pursue the acceptor here. Ross v. Jones, 22 Wall. 576; Sterling v. Trading Co., 11 S. & R. (Pa.) 179; Faulkner v. Faulkner, 73 Mo. 336; Moore v. Britton, 22 La. Ann. 65.

"As soon as the liability of the indorser was fixed by the nonpayment and protest, and at any time thereafter during the continuance of such liability, the indorsee bank had the right to apply any moneys coming into its hands in due course of business belonging to such indorser to the payment of the indorser's liability upon such contract, and the indorser had no right in law or equity to compel the bank to proceed against the acceptor, but, upon payment of the bill, he would have had the right to its surrender, whereupon he might have proceeded against the acceptor. 11 Mo. App. 144; 15 East. 428; 1 Esp. 66; 1 Rose, 232; 19 Ves. Jr. 25; 34 Barb. 298.

"The relation of the bank to its depositors is that of debtor and creditor, and its right to offset its indebtedness to the depositor against the indebtedness of the latter to it is of an equitable nature intended for its protection, and does not depend upon any statute in relation to offsets. It is generally said that it is optional with the bank whether it will avail itself of this right. 32 Mo. 191; 6 N. Y. 271; 34 Barb. 298; 2 N. Y. 352; 6 Wend. 610; 21 Me. 426; 16 Week. No. Cas. 509.

"The instances in which it has been held that the bank had the absolute right to determine whether it would or would not exercise its privilege were cases in which it was not appealing to the courts to apply any equitable principle in order to allow it to recover, as the Citizens' Bank of Buffalo is doing here against an innocent party to the paper who, but for the application of such principle, could not be held liable.

"If the Buffalo Forge Company had not transferred the bill before maturity, or if at the time of the indorsement the bank had known of the failure of consideration, it is clear that such failure would have been a complete defense. This is not disputed. McDonald Mfg. Co. v. Moran, 52 Wis. 203; Mann v. Nat. Bank, 30 Kan. 412.

"But, although in good conscience plaintiff in error ought not, as between it and the Buffalo Forge Company or any one claiming under or through the latter with notice, to be held to pay the bill, nevertheless it will not be allowed to assert its defense to the prejudice of the indorsee bank, because the latter has invoked the protection thrown round it by the laws as an innocent purchaser. As between the acceptor and the innocent holder, the latter will be absolutely protected because the former has carelessly launched upon the market its unqualified promise to pay, whereby the latter was induced to acquire same.

"But while the law protects the innocent holder at the expense of the negligent but innocent acceptor, it does not permit the former to use his vantage ground for the purpose of going beyond his protection and willfully inflicting on the latter a wrong in order to favor the fraudulent indorser who in justice and good conscience ought to pay the bill.

"In discussing this principle, in the case of Wright v. Hardie, 88 Tex. 657 (32 S. W. Rep. 887), this court, through Chief Justice Gaines, say: 'The doctrine which protects a bona fide purchaser of negotiable paper for value is maintained in part upon principles of commercial policy, but has a deeper foundation in the principle of an equitable estoppel. The maker of a promissory note, by signing and delivering it to the payee, asserts its validity, and by making it payable to the bearer, or to the

order of the payee, holds out an invitation to all the world to deal with it, as evidencing a valid debt. For that reason, and upon the principle that he who trusts most should suffer most, the law shuts off, as against an innocent holder, any defense the maker may have against the payee, in so far as it may be necessary to protect such holder in the rights acquired by his transfer. A recovery of so much upon the collateral paper as is necessary to discharge the debt secured is requisite for the protection of an innocent holder, although, as between the maker and the payee of the note, the hypothecation may have been fraudulent. More than this the holder cannot claim in his own right, nor can he claim as trustee of the transferor of the instrument, because the maker owes the latter nothing. Accordingly, we find that it is generally held that the pledgee in such a case is limited in his recovery to the amount of his debt.'

"Whether the doctrine upon which the courts allow the innocent holder of commercial paper to recover against the negligent but innocent acceptor maker is based upon broad principles of public policy intended to foster commerce, or upon the principles of an equitable estoppel, or both, it is clear that it extends no further than is necessary to the complete protection of the innocent holder, and cannot be extended so as to allow such holder to pervert the equitable principles upon which it is based for the purpose of aiding one party to a commercial instrument in obtaining an undue advantage over another.

"The bank had the undoubted right to say to the Forge Company: 'You have indorsed us a paper, which, as between you and the acceptor, the latter ought not to pay. We have money belonging to you in our hands sufficient to satisfy your contract of indorsement now due, and we elect to avail ourselves of our equitable right to apply the same as an offset and in settlement of your contract and return to you the paper, rather than pursue the innocent acceptor in another jurisdiction, especially since such pursuit cannot possibly be necessary for our protection. We will not use the shield thrown round us by law solely for our protection as innocent purchasers as a subterfuge to aid you in enforcing through us an unjust demand.' Such a position would have been unassailable in morals and in law. The bank, however, elected the contrary.

"The case then comes to this: The indorser in good conscience should pay, the bank has its funds in its hands sufficient to satisfy the demand with a perfect right in equity to offset same in satisfaction of the bill; the pursuit of the acceptor in a foreign jurisdiction is clearly not necessary to the bank's protection, but can only serve to allow the indorser to avail himself of the protection given by law to an innocent purchaser in order to cut the acceptor off from a just defense and compel it to pay a sum of money which in equity it should not pay.

"Under these circumstances, with knowledge of the failure of consideration, probably at the time of the filing of the original answer, but certainly when the depositions of its officers were taken as above stated, it presses the claim to judgment upon its plea of innocent purchaser, in a suit instituted at the instance and expense of the indorser. While expressly waiving its equitable right to offset the deposit, conferred upon it by law for its protection and which appears in this case to have been adequate to its complete protection, it invokes the application by the court of another equitable principle, not for its protection, but for the sole and evident purpose of aiding the indorser to obtain an undue advantage over the acceptor. We are of the opinion that under these circumstances, and for such a purpose, the bank was not entitled to the protection afforded by law to an innocent holder, and that, as between it and the acceptor, the deposit should be offset against the bill."

We have been unable to find any satisfactory ground of differentiation between the decision of the Supreme Court in the case just quoted from and the instant case. Indeed, able counsel for appellant have not suggested any real basis of distinction, but claim that the decision should not be followed, because a careful reading and analysis of the opinion will disclose that it was rendered without regard and without reference to the provisions of our statute (article 582, Revised Statutes 1911), which were apparently overlooked. This statute reads as follows:

"Any person to whom any of the said negotiable instruments may have been assigned may maintain any action in his own name which the original obligor or payee might have brought; but he shall not only allow all just discounts against himself, but, if he obtains the same after it became due, he shall also allow all just discounts against the assignor before notice of the assignment was given to the defendants; but, should he obtain such instrument before its maturity, by giving for it a valuable consideration, and without notice of any discount or defense against it, then he shall be compelled to allow only the just discounts against himself."

Since the original briefs were filed, however, counsel for appellees have examined the briefs and arguments and the motion for rehearing in the Supreme Court, and it is agreed by counsel that in a brief for the Citizens' Bank of Buffalo, filed in the Van Winkle Gin Case, the very article in question (then article 265) was called to the attention of the Supreme Court, as a statutory right that the bank should be compelled to allow only the just discounts against itself, by reason of its position as an innocent purchaser. Furthermore, on motion for rehearing, counsel for the bank specifically directed the attention of the Supreme Court again to this provision of the statute, and insisted that the decision of the court was in conflict with the statute, and also with the rule theretofore prevailing as to negotiable paper. In these circumstances, we must assume that the Supreme Court considered the statute in question, and decided that it was not applicable, or at least not in conflict with the decision of the court. This same rule was

applied in later cases, including Bank v. Menefee, supra, in which a writ of error was denied by the Supreme Court.

In addition to what has been said above, the writer is of the opinion that, if we should assume the altogether improbable fact that the Supreme Court and the other courts deciding this question have overlooked the statute referred to, the result would be the same, under the reasoning of those cases. To my mind the provisions of article 582 embody substantially the rule obtaining at common law or under the law merchant, and nothing more. The holdings referred to are simply to the effect that, notwithstanding this general rule, whether considered as a part of the law of negotiable paper or as statutory law, it could not, in equity, be applied for the protection of an innocent purchaser when the facts and circumstances of the case disclosed that the holder of the paper had notice of just and lawful defenses, and thereafter refused to avail itself of moneys of the indorser to reimburse itself, and to surrender the paper to the indorser. The principle announced and applied is that no person will be permitted to use the shield of an innocent purchaser when not necessary for his own benefit, but is for the advantage of an indorser in whose hands the paper would be subject to defenses. To permit this to be done, it is held, in effect would be to countenance fraud, which equity will not sanction.

Believing that the decision in Van Winkle Gin Co. v. Citizens' Bank and like cases are controlling, we overrule appellant's contention upon this point.

[1] Another point raised by appellant is that the court committed reversible error in admitting the testimony of a witness as to a statement made by Mr. Eberhardt, who was an attorney for the bank, and who was also a director and a member of the loan committee which passed upon the loan in question. The claim is that this statement as made by Mr. Eberhardt was several months after the filing of the suit, and that it could not bind the bank, because it was not part of the res gestæ, was made long subsequent to the transaction, and was not shown to have been made by Eberhardt in the discharge of his duty as an agent or attorney.

[2] In our view of the matter, it is not necessary to decide this question. As we construe the decision in Van Winkle Gin Co. Case, it is not necessary that there should in fact be any conspiracy between the indorser and the alleged innocent holder. The whole reasoning of the case is to the effect that, if the resort by the holder to suit in a foreign jurisdiction against the maker, who has just defenses against the original payee, is not necessary for the protection of the holder, but is necessarily for the advantage of such payee, the holder will not be permitted to invoke the doctrine of innocent purchaser,

under such circumstances as exist here. In at least one of the cases following that decision, namely, Bank v. Menefee, supra, the facts did not show any conspiracy.

The statement of Mr. Eberhardt, giving to it its greatest effect, had relation only to the issue which had been pleaded by appellees, that there was a conspiracy between the indorser and the bank to deprive them of their just defenses. The jury so found, and it may be assumed that their finding was based upon this testimony. But such finding was not necessary to the support of the judgment, and, as we believe, it may be wholly disregarded. Therefore, if it should be assumed that the evidence of the statement by Mr. Eberhardt was hearsay and incompetent, the result would be the same, because the other essentials necessary to invoke the rule applied in the Van Winkle Gin Case were proven.

[3] Appellant also complains of the submission of the issue and the finding of the jury thereon with relation to the net profits which appellees might reasonably have been expected to make during the life of the contract. The specific claim is that such damages are based purely upon speculation, and cannot form the basis of a valid offset against the note.

We have examined the evidence bearing upon this question, and we do not think the case falls within the rule that damages which are uncertain and speculative cannot be recovered. There is no uncertainty here as to whether any damages at all were suffered, but simply as to the amount of the damages which were sustained. There is ample testimony in the record to sustain the finding of the jury that appellees suffered damages legally recoverable far in excess of the amount of the note sued on.

All assignments have been carefully considered, and are overruled. No reversible error has been shown, and the judgment is affirmed.

Affirmed.

## On Rehearing.

We have carefully considered the able dissenting opinion of the Chief Justice, but are constrained to adhere to our former conclusion. We do not feel warranted in overruling a decision of the Supreme Court, as is virtually conceded in the dissent must be done, if we should reverse our previous holding. Especially so, when the opinion of the Supreme Court shows the question and authorities were carefully considered and the case elaborately reasoned, and that it has never been overruled or questioned by that court.

[4] We desire to reply to some of the points discussed in the dissenting opinion. Attention is called to the fact that in Van Winkle Gin Co. v. Citizens' Bank of Buffalo, the statute so strongly relied upon by the

Chief Justice for his dissent (article 307, Rev. Stat. 1895) was not discussed, nor even mentioned by the court. In the majority opinion, however, we pointed out that the very statute was cited in the briefs and in motion for rehearing, and that the very argument made in the dissenting opinion was presented to the Supreme Court, and the charge there made that the decision nullified the statute. Yet the motion was overruled. The court was then composed of Chief Justice Gaines, and Associate Justices Brown and Denman. It is inconceivable that such eminent judges overlooked the statute, or that they considered it in conflict with the decision. That case was decided January, 1896.

This very question was again before the Supreme Court on application for writ of error in Union National Bank v. Menefee nearly 15 years afterwards. Since writing the majority opinion, I have examined the original briefs in the latter case, and find that the statute was again cited and expressly relied upon. Not only that, but in the application for writ of error the bank's able counsel challenged the decision of the Court of Civil Appeals as having nullified the statute, and also pressed upon the Supreme Court the claim that the decision, as well as that in Van Winkle Gin Co. v. Citizens' Bank, was against the weight of authority, and seriously impaired the value and freedom of commercial paper. Virtually every authority cited by the Chief Justice here was cited in the briefs or application for writ of error there. But that is not all. The soundness of the decision in the Van Winkle Gin Case was directly and vigorously assailed, and the Supreme Court was asked to overrule it, because in conflict with the statute, and because of its destructive effect upon commercial paper. The question presented was the controlling one in the case. It is no disparagement of the opinion of the Chief Justice to say that counsel for the Union National Bank, in the Menefee Case, make just as strong an argument against the Van Winkle Gin decision as he has made here. Yet the Supreme Court, by refusing the writ, refused to overrule or modify the former decision. The personnel of the court had then changed, and it was composed of Chief Justice Brown and Associate Justices Ramsey and Dibrell.

The conclusion is irresistible that the Supreme Court has twice had this issue squarely before it. In each instance it is equally plain that, although the statute was not discussed, nor even expressly mentioned, it has in effect so interpreted the statute as to find it no insuperable obstacle to the rule announced in the Van Winkle Gin Case. It is also certain, and the opinion in the case just referred to bears intrinsic evidence, that our Supreme Court has not seen fit to follow certain decisions in other states cited

by the Chief Justice in his dissent here, and which were presented to the Supreme Court, and preferred what was regarded as the reasonable and just equitable doctrine, the reasons for which are fully given in the opinion of Mr. Justice Denman. In these circumstances we are firmly of the opinion that we should not go to the extent of declining to follow a rule to which the Supreme Court has been committed for practically 25 years, although strong reasons may be urged against it. If the case is to be overruled, we feel that the Supreme Court should do it, but we are not at all convinced that the decision is unsound.

[5] Aside from the constraint placed upon us by the previous decisions of the Supreme Court, we think we may suggest good reason for sustaining the doctrine of those cases. As to the statute, in addition to what was suggested by the writer in the majority opinion, it may well be said that article 307 should not be interpreted as is now claimed. The Chief Justice states that this article as to an innocent holder, confers upon such holder the statutory right that he shall in all circumstances be compelled to allow only the just discounts against himself.

"That the word 'only' as incorporated in that statute has but one meaning, which is that, if the matter pleaded as a defense does not *in law* constitute a just claim against such assignee, although it may be such as against his assignor, the assignee shall not be compelled to allow the same." (Italics ours.)

We are rather inclined to think that the term is susceptible of the construction, and would accord more with justice, that, if the defense does not, in law or in equity, constitute a just claim against the assignee, he shall not be compelled to allow discounts primarily existing only against the assignor. It is not unusual for our statutory law to embody equitable principles or rules as well as strict rules of law.

[6] Probably, as indicated by the reasoning of Judge Denman, that was the view of the Supreme Court as to the meaning of this statute, and it was merely held that it would be inequitable to permit the assignee, after maturity of the paper, which he had innocently acquired before maturity, to refuse to apply funds of the assignor, after notice of the vice in the paper and the defenses against it. As was said, to do so would be to permit the defense of innocent holder to be used as a shield, not for the protection of the holder, but for the benefit of the indorser or assignor who had fraudulently negotiated it. In other words, is it not true in equity to say that, in circumstances such as exist in the present case, and as existed in the Van Winkle Gin Co. Case and the Menefee Case, the defenses become just claims against the assignee, and that to compel the allowance thereof is but to require him, accord-

ing to the language of the statute, to allow "only the just discounts against himself." So interpreted, the statute would not seem to militate against the decisions of the Supreme Court.

It is suggested in the dissenting opinion that, about nine months after the Van Winkle Gin Case was decided, the Supreme Court, in Word v. Elwood, 90 Tex. 130, 37 S. W. 414, in an opinion by Mr. Justice Denman, expressly construed article 307, and it was held to control the matter of an assignment of negotiable paper, regardless of the rule of the law merchant. While perhaps very satisfactory reasons could be given why that case does not modify or impair the former decision, it ought to be sufficient to say that, nearly fifteen years after Word v. Elwood was decided, counsel in the case of Union Nat. Bank v. Menefee, supra, at page 17 of the application for writ of error, cited that case as a part of their attack on the Van Winkle Gin Case. Evidently, the Supreme Court did not consider that there was any conflict between the holding in Word v. Elwood and the previous decision.

We pass from the matter of the application of the statute in question to the correctness of the rule announced in the Van Winkle Gin Case, and the considerations urged by the Chief Justice against its soundness, independently of the statute. We do not care to argue this matter at length. Not only have the very same considerations been presented to the Supreme Court heretofore, and denied, as above pointed out, but the reasoning of Judge Denman appeals very strongly to us. What injustice can there be in holding that an assignee of commercial paper innocently acquired, in circumstances as found here, shall be required to protect himself from the funds of the indorser, not placed as a special deposit, but as a general deposit, and to turn the paper back to the indorser and let him fight it out with the maker, who claims just defenses? We can see no just quarrel with the doctrine, but it would seem to be founded on the broadest equity, as Judge Denman has convincingly stated.

[7] Again, it is stated in the dissenting opinion that such a rule interferes with the freedom of commercial paper, and places restrictions thereon. This may be granted. But do we not find that the very authority cited by the Chief Justice, Ruling Case Law, in the first paragraph quoted by him, recognizes that the weight of authority compels the assignee to consider the interests of indorsers or sureties upon strictly equitable grounds, in some circumstances? Is this not a restriction upon the freedom of the paper? Again, in Wright v. Hardie, 88 Tex. 658, our Supreme Court recognized another restriction upon commercial paper in the hands of a bona fide purchaser, holding the same as collateral. Still other instances might be cited where similar restrictions are enforced for sound

equitable reasons, such, for instance, as found in the case of Simmons v. Hodges, 250 Fed. 424, 162 C. C. A. 494, cited in our former opinion, which was a decision by the Circuit Court of Appeals for the Fifth Circuit. This case, by the way, cites with approval Van Winkle Gin Co. v. Citizens' Bank. Judge Grubb, speaking for the Circuit Court of Appeals, there said:

"The purpose of the doctrine of bona fide holder is protection only. It cannot be used by the holder to advantage the seller of the negotiable paper, which originated in fraud. Van Winkle Gin Co. v. Bank, 89 Tex. 147, 33 S. W. 862; Dresser v. M. & I. Co., 93 U. S. 92, 23 L. Ed. 815. Protection of the holder being the sole purpose of the rule, its application is limited to cases in which the necessity demands its application. It is also accompanied by a correlative duty on the part of the holder to protect the maker from injury resulting from the fraud, as far as he can do so consistently with due protection to himself."

There is much reason for saying that the restriction resulting from the doctrine approved in the Van Winkle Gin Case is not any more unreasonable or against sound public policy than those recognized in the text of Ruling Case Law, cited by the Chief Justice, in cases of protection afforded to indorsers and sureties, whose obligations are made for the benefit of the maker as well as the transferee. We recognize the force of the argument in the dissenting opinion, but we do not think it is sufficient to demonstrate that there is any such undue restriction upon commercial paper as to make it an unsound public policy. The fact that in a case of suretyship the assignee or party in whose favor the obligation of suretyship is made may release the surety at any time, and sue the maker alone, does not necessarily point to the conclusion that he cannot, in equity, be required to apply general deposits to his own protection, after notice of fraud or other vice in the paper, where he does not choose to release the surety, but seeks to hold both the maker and the surety.

[8] It is further argued in the dissent that, if a bank innocently holding commercial paper acquired from a customer should be required to apply the indorser's deposit to the satisfaction of the paper, after notice of defenses, it may result in requiring the customer, to whom it is returned, to pursue the maker in another jurisdiction. This is undoubtedly true; but what of it? This result is due to the solicitude of equity to prevent fraud, and of the application of the soundest considerations of justice. If the customer has circulated paper which he knows to have been fraudulently acquired, or is subject to just defenses, it is no hardship upon him to be required to sue the maker at his domicile. As stated by the Chief Justice, venue of suits is fixed by law, and but for the fraudulent negotiation the payee

would be required to resort to suit in another state only because the maker resides there. It would seem to be begging the question to say that the indorser might be able to produce evidence to overcome that submitted by the maker, and that by the doctrine invoked the indorser might be required to bring suit in another state, although there was in fact no failure of consideration. An answer to this suggestion is that the whole doctrine of the Van Winkle Gin Case rests upon the principle that, before the rights of the assignee can be defeated, the maker must prove fraud, failure of consideration, or some just defense; and the rule has no application where such defenses do not exist. There is no peril to the assignee where the maker is unable to establish his defenses, although there may be inconvenience due to the right of the maker to insist upon his protection in equity, and the failure of the assignee to protect him. It is the omission by the assignee of a duty, resting in good conscience and good morals, which, after all, causes the supposed inconvenience.

[9] Furthermore, it must be remembered that it is not in all circumstances that the rule of the Van Winkle Gin Case is to be applied. There may be circumstances which would render its application inequitable, and, when the facts are such, the reason for the rule failing, it will not be enforced.

[10] We think it proper to add that the dissenting opinion throughout treats the relation of the indorser here as one of suretyship. Mr. Brandt, in his valuable work on the Law of Suretyship and Guaranty, points out, in section 2 of his work, that ofttimes there is an important distinction between the rights and obligations of sureties and indorsers. The nature of the relation in the present circumstances is clearly pointed out by Justice Denman, and is in fact made the basic principle of the decision. We would not be justified in prolonging this opinion by quoting therefrom, but we refer to his language incorporated in the original opinion.

For the reasons indicated, the motion for rehearing is overruled.

Motion overruled.

KEY, C. J. (dissenting). While the writer did not announce any dissent when this case was originally decided by this court, he did not agree with his Associates in consultation, and reserved the right to file · a dissenting opinion, if he desired to do so, when the case was finally disposed of; and, as the other members of the court have concluded that the former decision should be adhered to, and the motion for rehearing overruled, and as the writer is thoroughly convinced of the correctness of his original views, and as the question about which we differ is one of great importance, he feels constrained to dissent from the decision and the action of the court in overruling the motion for rehearing; and

the reasons for such dissent will now be given.

As shown by article 307 of the Revised Statutes 1895, which was first enacted many, many years ago, it is the statutory law of this state that, when a negotiable instrument is assigned to a person not a party to the instrument, and he acquires it before maturity, for a valuable consideration, and without notice of any discount or defenses against it, then he is only compelled to allow discounts or offsets against himself. It is immaterial whether that statute followed the rule in equity, or enlarged or curtailed such rule. Ever since its enactment it has been, and is now, a part of the written law of the state, which it is the duty of the courts to enforce, no matter what ·may have been the reason which actuated the Legislature in its enactment, and regardless of the fact that its enforcement may result in a hardship to the maker of such an instrument. It is free from ambiguity, and this is especially true as to that portion of it which reads:

"But should he obtain such instrument before its maturity, by giving for it a valuable consideration, and without notice of any discount or defense against it, then he shall be compelled to allow only the just discounts against himself."

Its subject is the defenses which the maker and person primarily liable may interpose when suit is brought against him upon a negotiable instrument by an assignee who is not an obligor, and the concluding clause thereof declares, in plain and certain language, that, if the assignee obtained such instrument before maturity, for a valuable consideration, and without notice of any discount or defense against it, then he shall be compelled to allow only the just discounts against himself. The word "only" as incorporated in that statute has but one meaning, which is that, if the matter pleaded as a defense does not in law constitute a just claim against such assignee, although it may be such as against his assignor, the assignee shall not be compelled to allow the same.

It cannot be successfully denied that the Legislature had the power to enact that statute, and to declare that, when the conditions therein enumerated were shown to exist, the owner of the instrument should not be compelled to allow any discounts against his assignor, or any one else except himself; and the fact that the enforcement of the statute may, in a particular case, result in hardship to the maker can afford no excuse for the failure of the courts to refuse to apply it to such case. 'This is true because the Legislature has seen proper to make it a part of the statutory law of the state, and by the use of the word "only" that body, which is the lawmaking department of the government, has declared, in effect, that no exceptions to the statute shall

be made, regardless of what may be the surrounding circumstances of any particular case.

According to my view, that statute has direct application to this case. But the majority opinion proceeds mainly upon the theory that our Supreme Court has held otherwise in Van Winkle Gin Co. v. Citizens' Bank of Buffalo, 89 Tex. 147, 33 S. W. 862, although in that decision the court did not refer to or discuss the provision of the statute now under consideration. It is true, as stated in the majority opinion, that statute was cited in the original brief of the appellee, and also in the motion for a rehearing, and the writer is not prepared to say that the Supreme Court did not read the statute, and conclude that it did not apply to that case. However, it is not so stated in the opinion, and, with all respect for the Supreme Court, the writer believes that the decision is wrong, and ought to be overruled; and the reasons for that belief will now be stated.

Ruling Case Law, a modern and very valuable addition to our legal literature, contains the following text:

"*Duty to Third Person to Exercise Right of Set-Off in General.*—While a bank which is the holder of a note, and has on deposit at the time of maturity a sum to the credit of any party liable to it on the note, sufficient to pay it, and not previously appropriated by the depositor to be held for a different purpose, may apply the deposit to the payment of the note, yet it is not, in general, bound to do so. The cases where the right becomes a duty on the part of the bank rest on the special equity of the party—usually the indorser—to have the payment enforced against the depositor as the one primarily liable. But, where the bank holds funds of the maker when the note matures, it seems, according to the weight of authority, that it is bound to consider the interests of the indorsers or sureties, and, if it allows the maker to withdraw his funds after protest, and the indorsers are losers thereby, the bank cannot hold them liable on the note. The reason of this rule is that the maker is the principal debtor, and liable to all the indorsers, whose undertaking is to pay if he does not. If the holder surrenders the money or securities of the maker, he parts with that in which all who have a right to look to the maker for indemnity have a definite interest; and if his act inflicts loss on them, he must stand, as to the money or securities surrendered, in the place of the maker. And, as has been said, if the bank at the maturity of a note held by it holds funds that by the scratch of a pen it can apply upon the note, thus securing itself, it is difficult to see why neglecting so easy a means of security is not as improper as giving up collateral expressly designated for the purpose of securing the note. Also, it is the extent of the right to the security, rather then the source from which that right springs, that should determine the question whether the creditor can voluntarily surrender the security without releasing the surety. If the deposit has not been specifically

made applicable to a particular purpose, the fact that the depositor directs the bank not to apply the deposit to the payment of the note has been held not to affect the bank's duty to do so in exoneration of an indorser. If the deposit is specific, the bank itself has no right to apply it in payment of an indebtedness of the depositor, and of course it is under no duty to an indorser to make such application. Also, though the authorities are not in accord, it would seem that, in order to impose a duty upon the bank to apply the deposit of the maker to the payment of the note, the deposit must have been sufficient to pay the note, and it must have been sufficient at the time the note matured; the bank is under no obligation to indorsers or sureties to apply subsequent deposits to the payment of the note.

"*Duty Restricted to Application of Deposit of Maker.*—The duty of the bank to appropriate a deposit to the payment of a note has not been carried by any case beyond the deposit of the maker. Nor is it desirable that it should be. On the face of the paper, the maker is the party to pay, and, while the bank may, upon dishonor, secure payment from the deposit of any party liable to it, yet there is great force in the reasons for limiting its duty to do so to the party legally answerable in the first instance on the face of the paper. The rule thus rests on a liability fixed by law, and capable of immediate and conclusive determination by the evidence of the note itself. Otherwise it is thrown open to contest on the private arrangements of parties, to questions of notice and proof, and to all the uncertainties of the final ascertainment of the facts. While money deposited becomes the property of the bank, yet that result flows from the nature of money, which is to be measured by amount, and not by physical identity. Except for this characteristic, a deposit of money to be returned on demand would be, like the deposit of any other article, a mere bailment. But though, for this reason, the title to money deposited passes to the bank, yet the whole business of banking is founded on the faith of the immediate availability of the deposit, as money, for the use of the depositor; and any rule that interfered with the freedom of action of either bank or customer, by compelling a stop of their dealings with each other to examine the relations of other parties to the deposit, would go far towards destroying that instant convertibility which is the essence of the business. Under this rule a bank is under no obligation to apply the deposit of an indorser of a note to its payment; and this is true although the note was made for the accommodation of the indorser, who, so far as the maker is concerned, is primarily liable thereon. When a bank becomes the holder of an indorsed note, acquired before maturity, for value, and without any notice of equities, and its clerk charges the note to the account of the indorser upon its maturity and protest, but afterward, by direction of the bank cashier, corrects this, by entry of a credit, so as to make the indorser's account stand as before, the act of the clerk in so charging up the note is not a payment devesting the title of the bank, nor is the subsequent entry of the credit so made a new purchase of the note after protest, and subject to the equities between the original parties to it,

but the bank may still recover on the note against the maker."

3 R. C. L. §§ 224–225.

That text is followed up by another, beginning with the statement that there are a number of cases which deny that the bank is under a general duty to apply the deposit of the maker of a note to its payment, in exoneration of indorsers or sureties, and hold that its failure to do so, and permitting the depositor to subsequently withdraw the deposit, does not release the indorser or surety from liability, and that it has been held in some cases that the fact that the surety or indorser demands that the bank make the application is immaterial. 3 R. C. L. § 226. Decisions by several states are cited in support of that proposition, but, as that question is not involved in this case, they will not be cited here further than to say that one of the leading and ablest opinions upon that side of the question is that of Cobb, P. J. of the Supreme Court of Georgia, reported in Davenport v. State Banking Co.. 126 Ga. 136, 54 S. E. 977, and 8 L. R. A. (N. S.) 944, 115 Am. St. Rep. 68, 7 Ann. Cas. 1000, and the latter report of the case is accompanied by a very full and interesting note, giving decisions upon both sides of the question.

The rule announced in Ruling Case Law, as copied above, to the effect that while a bank, who is the bona fide holder of negotiable paper, and entitled to protection as such, may apply a deposit in the bank, made by either the maker or surety, to the satisfaction of its debt, it is not compelled to do so as to a deposit made by the surety, and may permit him to withdraw the money thus deposited without in any wise affecting the liability of the maker, is well supported by an array of authorities and by sound reason. In fact, in so far as I have had time to trace the authorities, the statement in the text that the duty of a bank to appropriate a deposit to the payment of a note has not been carried by any case beyond a deposit of the maker, is correct up to the time our Supreme Court decided the Van Winkle Gin Case, which applied it to a deposit by a surety. If, as construed by my Associates, that case holds that, when there is a failure of consideration, as between the maker and the original payee, although the assignee thereof paid value for it before maturity and without notice of such failure of consideration, if he is subsequently notified thereof, and thereafter fails to apply a debt owing by such assignee to the assignor, but pays it to the latter, the maker will be relieved from liability to the assignee, I am so firmly convinced that the decision is radically wrong, whether tested by the statute heretofore referred to or by the rules of the common law, and, if permitted to stand, will result in such detriment to the commercial interests of this state as to justify this protest against it, with the hope that the Supreme Court will reconsider the question, overrule that case, and re-establish the law of this state in harmony with that which prevails in other jurisdictions.

As heretofore shown, that decision is believed to be unsound because of the fact that it disregards and nullifies a plain provision of statute law, and requires an assignee of a negotiable instrument, who is a bona fide holder for a valuable consideration, and without notice, to allow as a satisfaction of the debt a claim against another party, and not against himself, although the statute referred to declares, in plain and distinct language, that any person so situated shall not be compelled to allow any claims other than those against himself. But, aside from the statute, that decision is believed to be radically unsound, for the reason that it proceeds upon the assumption that, because the plaintiff in that case had received deposits made by a surety and had the right to apply such deposits to the payment of the debt, for which both the maker of the instrument and the surety were liable, its failure to make such application after it was apprised of the fact that the consideration for the written obligation had failed created an equity in favor of the maker of the instrument and entitled him to be discharged. This argument seems to overlook the fact that, as between the plaintiff and the maker of the instrument and the assignor, the maker was the principal obligor, who was primarily liable to the plaintiff, and the assignor was merely a surety, and only secondarily liable; and, if not unanimous, the authorities are overwhelmingly in favor of the proposition that the holder of a promissory note or other commercial paper may release a surety thereon from his entire liability without affecting the liability of the principal; and this may be done either with or without a consideration moving the assignee to pursue the course referred to. Therefore, while, if he chooses to do so, he may apply a debt which he owes to the surety to the satisfaction of the debt for which the surety is bound, he owes no duty to the principal to pursue that course, and the latter has no right to complain if he does otherwise. The relation of suretyship is created for the sole benefit of the creditor or payee in the instrument, and therefore, if he sees proper to release the surety, no matter how easy it may be to collect the debt from him, and how much hardship it may impose to compel the principal obligor to pay it, he has the right to do so, and the latter cannot be heard to complain. In other words, a principal debtor, on account of business reverses after executing the obligation, may not be able to pay it, and the surety thereon may be a millionaire, and able to do so

without any inconvenience whatever; yet the payee of such instrument can voluntarily discharge the millionaire surety without affecting in any wise the liability of the poverty-stricken principal. It is not deemed necessary to cite authorities in support of that proposition; and, such being the law, upon what ground, equitable or otherwise, can it properly be held that anything short of the payment of the debt will release the liability of the maker when the written obligation is held by an assignee who occupies the position of bona fide purchaser. The failure to collect the debt from the surety when that could easily have been done does not amount to a payment, and, as such assignee has the right to voluntarily discharge the surety from liability, he certainly has the right to forego his privilege of collecting the debt from him without affecting the liability of the principal.

In the main, the correctness of these views concerning the difference between the liability of surety and principal is not denied by the opinion in the Van Winkle Gin Case, but Mr. Justice Denman, who wrote that opinion, attempts to draw a distinction because of what had been said by that court in a former case. In the Van Winkle Gin Case it is said:

"But while the law protects the innocent holder at the expense of the negligent but innocent acceptor, it does not permit the former to use his vantage ground for the purpose of going beyond his protection and willfully inflicting on the latter a wrong in order to favor the fraudulent indorser who in justice and good conscience ought to pay the bill.

"In discussing this principle, in the case of Wright v. Hardie, 88 Tex. 657 (32 S. W. Rep. 887), this court, through Chief Justice Gaines, say: 'The doctrine which protects a bona fide purchaser of negotiable paper for value is maintained in part upon principles of commercial policy, but has a deeper foundation in the principle of an equitable estoppel. The maker of a promissory note, by signing and delivering it to the payee, asserts its validity, and by making it payable to the bearer, or to the order of the payee, holds out an invitation to all the world to deal with it, as evidencing a valid debt. For that reason, and upon the principle that he who trusts most should suffer most, the law shuts off, as against an innocent holder, any defense the maker may have against the payee, in so far as it may be necessary to protect such holder in the rights acquired by his transfer. A recovery of so much upon the collateral paper as is necessary to discharge the debt secured is requisite for the protection of an innocent holder, although, as between the maker and payee of the note, the hypothecation may have been fraudulent. More than this the holder cannot claim in his own right, nor can he claim as trustee of the transferer of the instrument, because the maker owes the latter nothing. Accordingly we find that it is generally held that the pledgee in such a case is limited in his recovery to the amount of his debt.'

"Whether the doctrine upon which the courts allow the innocent holder of commercial paper to recover against the negligent but innocent acceptor maker is based upon broad principles of public policy intended to foster commerce, or upon the principles of an equitable estoppel, or both, it is clear that it extends no further than is necessary to the complete protection of the innocent holder, and cannot be extended so as to allow such holder to pervert the equitable principles upon which it is based for the purpose of aiding one party to a commercial instrument in obtaining an undue advantage over another."

If in deciding the Van Winkle Gin Case, the Supreme Court construed Wright v. Hardie, 88 Tex. 653, 32 S. W. 885, therein referred to, as in any wise placing a limitation upon the right of the assignee to release from liability any one bound to such assignee or payee as a surety only, I submit that Wright v. Hardie does not warrant any such construction. In other words, it was held in that case that the bona fide holder of a negotiable instrument held as collateral for an existing debt was only entitled to recover the amount of the debt secured by such collateral, and it was in that connection that the court said:

"A recovery of so much upon the collateral paper as is necessary to discharge the debt secured is requisite for the protection of an innocent holder, although as between the maker and payee of the note, the hypothecation may have been fraudulent. More than this, the holder cannot claim in his own right, nor can he claim as trustee of the transferer of the instrument, because the maker owes the latter nothing."

In other words, it was there held that the plaintiff was only entitled to recover from the defendant such amount as was necessary to make the plaintiff whole, while in the Van Winkle Gin Case it was held that the defendant was released from all liability, and plaintiff not entitled to recover anything. The latter case seems also to proceed, in part, upon the proposition that, while, generally speaking, an assignee who is a bona fide holder of commercial paper is not compelled to apply a debt owed by him to a surety on such paper, and may pay the debt owing by him to the surety without affecting the liability of the principal, still, if he knows that the principal has a good defense as against the surety, who was the original payee, and thereafter pays to such surety the debt owing to him by the assignee, and the maker resides in a different state from that in which the surety resides, and such surety agrees to pay the expense of the suit brought against the maker, such conduct will constitute a fraud as against the maker, and release him from liability to the assignee. It is submitted that the holding of the Supreme Court in that respect is unsound for two reasons, which are:

(1) The protection of such bona fide holder is secured by statutory enactment, and therefore he does not have to resort to any principle of equity as seems to be contemplated in the opinion in the Van Winkle Gin Case; and (2) as the obligation of suretyship is for the protection of the payee or other holder, and not in any wise for the benefit of the maker of commercial paper, the payee or person who is entitled to the benefit of such suretyship may release the surety at any time, and sue the maker alone, regardless of what may be his motive for so doing.

While in the Van Winkle Gin Case the Supreme Court did not mention article 307 of the Revised Statutes, nine months later, in the case of Word v. Elwood, 90 Tex. 130, 37 S. W. 414, in an opinion by the same judge who wrote the opinion in the Van Winkle Gin Case, that statute is copied and construed. The plaintiff in that case brought suit upon a promissory note upon the back of which was indorsed a written guaranty. The defendant pleaded a failure of consideration, but the trial court decided the case in favor of the plaintiff, on the ground that he was an innocent holder for value, etc. The Court of Civil Appeals for the Second District certified to the Supreme Court the question whether or not the indorsement on the back of the note constituted an assignment so as to bring the case within the meaning of the law merchant regulating the transfer of negotiable paper, citing certain authorities. The Supreme Court stated that the authorities cited indicated a conflict of opinion as to how the question should be answered under the law merchant, but said it was not necessary to decide that question, inasmuch as the law upon that subject is now regulated by article 307 of the Revised Statutes, which the court set out in full, and then proceeded:

"An instrument is 'assigned' within the meaning of this statute when it is transferred from one to another. The form of the transfer and whether written or verbal is immaterial. The statute extends its protection to all assignees coming within its terms, though they may not have acquired the instrument in accordance with the technical rules regulating transfers under the law merchant. Under our construction of the statute we do not deem it important in this case to determine whether the writing on the note constituted a technical indorsement, and therefore do not answer the question certified."

In that case the Supreme Court held, as it should have held in the Van Winkle Gin Case, that the law regulating the rights of a bona fide holder of negotiable paper is embodied in and fixed by the article of the statute referred to, regardless of what might have been the rights of the parties, if the statute had never been enacted. That article is a portion of title 16, Revised Statutes, which contains a number of articles relating to notes and other written instruments, and that entire title is part of the statutory law of this state, and those who come within its purview are subject to all the liabilities it places upon them, and entitled to all the benefits it secures to them; and it is my profound conviction that the decision in this case by the court below and its affirmance by this court has deprived the appellant of a plain statutory right.

Also, and aside from the statute, and for reasons heretofore stated, I think the decision is wrong, whether tested by the common law or the rules of equity. If the Van Winkle Case is permitted to stand as the law of Texas, instead of commercial paper being a courier without luggage, as it was long ago aptly described by an able judge, using as a metaphor an expression now in common use in this country, it will carry excess baggage, which will greatly retard its circulation and tend to impair its value as a commercial asset. To illustrate: When a bank has a customer who makes daily deposits, and from whom it purchases a negotiable instrument before maturity and pays value therefor without notice of failure of consideration, if the maker of the instrument notifies the bank that he contends there has been a failure of consideration, then, if thereafter the bank allows the original payee who has assigned it to the bank, and become liable as surety to check out all of his funds, the maker, if his contention be true, will be released from liability; in order for the bank to be safe, it will be compelled to collect the debt from the surety, and thereby force the latter to bring suit against the maker, although he may reside in a distant state.

Also it should be borne in mind that in the Van Winkle Gin Case and in this case the sureties were not parties to the litigation, and it may be that they could have produced testimony which would have overcome that submitted by the makers of the instruments. But, if the doctrine applied in these two cases is to stand as the law in this state, it is reasonable to suppose that in all such cases the bank or other innocent holder of such commercial paper will apply any debt such bank or holder may owe to the surety in satisfaction of the debt as soon as notice is received that the maker claims that there was a failure of consideration, and this will result in forcing the surety to sue the maker, although the latter may reside in another state, and although there may, in fact, be no failure of consideration; and, if equities are to be considered, it would seem that the courts ought not to so construe the law of suretyship as to place any such burden upon the surety, whose liability is solely for the benefit of the holder

of the negotiable instrument, and not for the benefit of the maker.

The writer fails to see where there is any ground whatever in the Van Winkle Gin Case, or in this case, for claiming that any fraud had been perpetrated upon the maker of the instrument. The surety had not signed it for his benefit, and therefore had the right to enter into an agreement with the holder to the effect that, if he would sue the maker, and not the surety, the latter would pay the expense of the suit. Such an agreement violated no duty that the surety owed the maker, and therefore it is immaterial what, if anything, was the consideration for it. Nor was it material that the failure of the plaintiffs in the two cases to apply to the satisfaction of the debts so secured the debts which the holders owed to the sureties might have resulted in forcing the makers to bring suit against the sureties in another state from that in which the makers resided. The venue of suits is fixed by law, and the fact that the assertion of a legal right may result in compelling the defendant to bring a suit against a third person in another state is no evidence of fraud, and is utterly immaterial to any question in the case.

In conclusion, it may not be amiss for the writer to disclaim any sentiments of disrespect for our Supreme Court. On the contrary, I have at all times entertained great respect for that tribunal; and this is especially true of the three able members who constituted the court at the time the Van Winkle Gin Case was decided. During all the time I have served upon this court, in so far as I now recall, I have written but two other opinions known to be in conflict with decisions of the Supreme Court; and my only purpose in writing this opinion is to contribute something toward getting the law settled as I firmly believe it should be.

For the reasons here stated, I respectfully dissent.