[No. 14108. Department Two. February 6, 1918.]

NETHERLANDS AMERICAN MORTGAGE BANK et al., Respondents, v. AUGUST GRAFKE et al., Appellants, JENNIE H. FORSYTH, Respondent.[1]

SUBROGATION—REMEDIES OF CREDITORS—RECOURSE OF SECURITY TO SURETY. Where the purchasers of lands were defrauded by the false representations of the vendor, who put up mortgage notes as collateral security for a loan from an innocent holder in due course which was also secured by other direct security from the vendor, equity will not permit such holder of the mortgage to foreclose its collateral security against the purchasers while the other direct security from the vendor may be ample to pay the debt; since subrogation of a creditor to security given by the principal debtor to a surety for the debt will be allowed when the equities of the case demand it.

Appeal from a judgment of the superior court for Benton county, Linn, J., entered August 22, 1916, upon findings in favor of the plaintiffs, in an action to foreclose a mortgage, tried to the court. Reversed.

*Morton T. Hunter,* for appellants.
*Parker, Laberge & Parker,* for respondents.

MOUNT, J.—This action was brought to foreclose a mortgage, given by defendants to Charles E. Forsyth, upon lands in Benton county. This mortgage was assigned by Forsyth to the Netherlands American Mortgage Bank as collateral security for a note executed by ·Forsyth to that bank. Five other actions of the same character were brought at the same time, and were consolidated and tried in this action—all depending upon the same state of facts. The defenses were that the notes and mortgages executed by the defendants to Forsyth were procured by fraud; and that the Netherlands American Mortgage Bank had notice of the fraud

[1]Reported in 170 Pac. 876.

and was not a holder in good faith.  Upon a trial of these issues, the trial court was of the opinion that the notes and mortgages sued on were obtained by fraud, but that the Netherlands American Mortgage Bank was a holder in due course, and for that reason entered a decree of foreclosure.  The defendants have appealed.

The record is voluminous.  The facts are somewhat involved, but we think they may be briefly stated as follows:  In the year 1909, Charles E. Forsyth and wife were the owners of 266 acres of land along the Columbia river, in Benton county.  They caused this land to be surveyed and platted into tracts containing approximately ten acres each.  This land was designated as the "River Front Orchard Tracts."  Forsyth and wife caused two pumping plants to be erected on the land for the purpose of irrigating the entire tract of 266 acres.  In the fall of 1909, Forsyth entered into a contract with one Sylvester, a resident of the state of New Jersey, for the sale of the land.  The contract provided that Sylvester should pay Forsyth $180 per acre, net, for the land, and that Sylvester should retain all in excess of that sum which he might receive for the land; that, instead of Forsyth conveying the land to Sylvester, the parcels, as sold, should be conveyed directly by Forsyth and wife to the respective purchasers; that the cash payments received for the tracts sold should be divided between Sylvester and Forsyth in the proportion that $180 bore to the price for which the land was sold; that notes and mortgages taken for deferred payments should run to Forsyth and that the proceeds of such payments, when received, should be divided between Forsyth and Sylvester, as above stated.  Forsyth lived in this state upon or near the land in controversy.  Sylvester was a resident of the state of New Jersey, and all sales were made in that state and in the states of New York and Pennsylvania.

After making this contract, Sylvester and one Benny conceived the idea of segregating the ownership of the irrigation plants from the ownership of the land. In pursuance of this plan, Forsyth conveyed one of the irrigation plants to Sylvester and took the joint note of Sylvester and Benny for the sum of $6,000 in payment of the purchase price of that plant. The payment of this note was secured by a mortgage upon the plant conveyed. Sylvester and Benny thereupon caused a corporation, called the "River Front Power & Irrigation Company," to be formed under the laws of New Jersey, with a capital stock of $50,000, consisting of 500 shares, of the par value of $100 each. After the organization of this corporation, Sylvester conveyed the irrigation plant, previously conveyed by Forsyth to him, to the corporation, and, in return therefor, certificates of stock were issued to Sylvester of the par value of $6,000. Benny and Sylvester each paid into the company $500, and five shares of the capital stock of the corporation were issued to each therefor. Sylvester transferred to Benny one-half of the shares issued to him in payment for the plant. Then, 69 shares of the capital stock were assigned by Sylvester and Benny to Forsyth as security for the note for $6,000, which Forsyth held, secured by a mortgage upon the irrigation plant. Sylvester and Benny then proceeded to sell the land at the price of $300 per acre. With each contract they issued a water-right certificate entitling the purchaser to a proportionate interest in the property of the corporation, embracing the water right, and entered into a contract with each purchaser to care for and cultivate the land for a period of four years, at $75 per acre, per annum. Later, it was concluded that the irrigation plant was not of sufficient capacity to irrigate the entire tract, and Forsyth sold and conveyed the additional irrigation plant to the River Front

Power & Irrigation Company, taking in payment the note of that corporation for $4,000, and, at the same time, taking the mortgage of the corporation upon the plant conveyed as security. Benny and Sylvester sold the land in parcels to divers persons, among them the appellants in this case. Prior to the time these sales were made, a prospectus was written by Forsyth and forwarded to Sylvester and Benny, in which it was stated, among other things, that the purchase price of a ten-acre tract would be $3,000; that the operating expense for caring for the property, planting it to trees, etc., would be $3,000 for the four years; that the return from the crops for the four years would amount to $13,750; and that profits on an investment of $6,000 would be $7,750 in four years. The method by which this profit was to be brought about was then stated. It was stated that the soil was volcanic ash, nine to thirty feet deep; that the sun shone constantly from spring to fall; that the soil was without rocks; that there was plenty of water for irrigation; that crops never failed; that apples were sold at $2.50 per box; and other misrepresentations of that character.

Upon these representations, made by Sylvester and Benny, the tracts were sold and deeds were executed by Forsyth and wife, and mortgages taken back from the purchasers direct to Forsyth and wife. After these sales were made, and in the spring of 1910, the River Front Power & Irrigation Company had collected from the purchasers something over $18,000 on account of the contracts for the care of the land. The water company, in the spring of that year, employed a superintendent to carry out its contract for the care and cultivation of the land. This superintendent cleared a portion of the land, set a portion of it to fruit trees, and abandoned the property. Mr. Forsyth then under-

took to carry on the operation of the plants, but without success. In January of 1911, one Schoenamsgruber, who was one of the purchasers of these tracts, came from New Jersey to the land in question and interviewed Mr. Forsyth. After receiving a statement of conditions then existing upon the land, Schoenamsgruber returned to New Jersey, where the other purchasers were notified of the conditions then existing. A meeting of the purchasers was then held, and it was arranged to call Mr. Forsyth from this state to New Jersey; money was advanced for his expenses; he went to New Jersey in February, 1911; and a meeting was held. Mr. Forsyth made a report which was discussed at that meeting, and it then developed that Sylvester was interested in unpaid notes of different purchasers, which Forsyth held, in the aggregate sum of more than $21,000. It was arranged that the amounts due Sylvester should be credited *pro rata* on the notes of the purchasers held by Forsyth. Those credits were given. Then it was arranged that the owners should form another corporation under the laws of New Jersey, known as the "Cooperative Orchards Company," to which the River Front Power & Irrigation Company conveyed the irrigation plants. The corporation was so formed and Benny and Sylvester conveyed the two irrigation plants to one John Gifford, as trustee, to be held by him until the Cooperative Orchards Company should complete its organization. The plan was carried out, and, after this was done, Forsyth satisfied the mortgage of $4,000 given to him by the River Front Power & Irrigation Company for the purchase of the irrigation plant last conveyed and credited $1,000 on the $6,000 mortgage previously given by Sylvester for the purchase of the irrigation plant first conveyed to him.

In February, 1911, Forsyth extended the time of payment of the principal of the notes given by each of the

purchasers for a period of one year after maturity of such notes. In that same February, Mr. Shoenamsgruber came to Washington and took charge of all the property, and has remained ever since. In January, 1912, Forsyth returned to New Jersey; met all the landowners interested in this litigation, except one Whitman; and an adjustment was made between Forsyth and the purchasers, by which the notes and mortgages held by Forsyth, and which had been given in 1910, were surrendered and cancelled by Forsyth; and he took, in lieu thereof, certain cash payments and notes and mortgages from the respective purchasers for the amounts remaining unpaid. Thereafter, in February, new notes were given to Forsyth. On the 10th of January, 1913, Forsyth and wife borrowed $12,-000 from the Netherlands American Mortgage Bank, and, as security for the repayment of this sum, gave a mortgage direct to the Netherlands American Mortgage Bank upon 86 acres of land owned by them in Grant county, and a trust agreement for the conveyance to one Dameyer, in trust, of 322 acres of land in Grant county. At the same time, Forsyth transferred to the bank the notes and mortgages in this suit. The interest falling due in February, 1914, on these notes in suit was not paid, and this action was brought by the bank and Charles E. Forsyth to foreclose the mortgages. The mortgage given by Forsyth and wife upon the 86 acres, and the trust conveyance of 322 acres, were not included in the suit. Forsyth joined as a party plaintiff. After the suit was brought, Charles E. Forsyth, one of the plaintiffs, died, and his wife was substituted as a party plaintiff.

These are, in substance, and briefly, the facts of the case. We have carefully gone through the statement of facts and exhibits and we think there can be no doubt

that Charles E. Forsyth instigated the whole scheme
for selling the tracts which he had platted and desig-
nated as the River Front Orchard Tracts; that Sylves-
ter and Benny were merely his agents; that the repre-
sentations made by Forsyth and Benny and Sylvester
were fraudulent misrepresentations; and that the sales
were made by Benny and Sylvester to the defendants,
who had no opportunity to examine the land, and who
relied implicitly upon the information and representa-
tions made by Benny and Sylvester, which were pal-
pably fraudulent and misleading. We are of the opin-
ion, further, that, after the defendants and other pur-
chasers had been informed by the representative whom
they sent out here that the conditions on the lands pur-
chased in this state were not as represented, they were
again misled by the representations of Mr. Forsyth at
the time the renewal notes were made in 1912. So that,
if this were an action by Mr. Forsyth to recover upon
these notes, we think recovery would necessarily fail
because of the fraudulent method by which the notes
and mortgages were secured; but the trial court found,
and we think correctly, that the Netherlands American
Mortgage Bank, at the time it made the loan of $12,000
to Forsyth and wife, was an innocent holder of the
notes sued on. The appellants contend, and we think
justly, that the Netherlands American Mortgage Bank
should be required to foreclose the primary mortgage
upon the 86 acres and the trust conveyance of 322 acres,
of land in Grant county, before proceeding to hold
these appellants upon these collateral notes and mort-
gages. These appellants have been defrauded by For-
syth. The Netherlands American Mortgage Bank is
an innocent holder of the notes and mortgages pro-
cured by Forsyth from these appellants. It would be
unjust to permit the Netherlands American Mortgage
Bank to collect from these appellants when that bank

has ample other security from Forsyth and wife for the loan of $12,000. If the other security is not sufficient, then, of course, these defrauded persons must suffer by the payment of whatever balance, may be due from Forsyth and wife upon the $12,000.

It is argued by the respondents that the respondent Netherlands American Mortgage Bank, being an innocent holder of the notes and mortgages executed by the appellants, has a right to bring an action to foreclose upon any part of its security. This is, no doubt, correct, when there are no equities which would stand in the way of such an action; but in this case there are two innocent parties, namely, these appellants, and the Netherlands American Mortgage Bank, which holds the notes in good faith. If one of these must suffer, it of course must be these appellants; but it appears from the record before us that, if the Netherlands American Mortgage Bank is required to foreclose the direct security which it had from Forsyth and wife, these appellants may not suffer, whereby, if the bank is permitted to foreclose against these appellants alone, as it seeks to do in this case, then these appellants alone must suffer the great wrong which has been imposed upon them by one of the respondents, namely, the Forsyth estate. In the case of *Johnson v. Martin,* 83 Wash. 364, 145 Pac. 429, L. R. A. 1916C 1057, in a case which is closely related to the case before us, we said, at page 374:

"Equity will seize upon and execute a trust when derelict between a principal debtor and his creditor, when the subject-matter of the trust has been pledged by the debtor to meet a specific obligation that the debtor is primarily obligated to pay and but for which the trust would not have been created,

" 'upon the ground that the surety, being the creditor's debtor, and in fact occupying the relation of surety to another person, has received from that per-

son an obligation or security for the payment of the debt, which a court of equity will therefore compel to be applied to that purpose at the suit of the creditor.' "

And then, after discussing the right of subrogation, we said:

"The supreme court of this state has taken its stand with those courts which have declared that the right of subrogation will be allowed when the equities of the case demand it. *Murray v. O'Brien*, 56 Wash. 361, 105 Pac. 840, 28 L. R. A. (N. S.) 998."

And in the case of *Canadian Bank of Commerce v. Sesnon Co.*, 68 Wash. 434, 123 Pac. 602, we said, at page 439:

"In this state (and in the absence of a contrary showing we will presume the law of the place of indorsement to be the same) an indorsee of a note taken as collateral security is a holder in due course to the extent of his interests, if the note is taken before maturity and without notice of any existing equities between the maker and the original payee. *Peters v. Gay*, 9 Wash. 383, 37 Pac. 325. But the rights of such a holder are restricted to his interests; the rule being that, where the maker of a negotiable instrument, indorsed as collateral security, has a defense against the original payee of the instrument, the indorsee can in no event enforce payment in excess of the amount which the note is pledged to secure." (Citing a number of cases.)

We think that rule applies with force to this case. Here, the Netherlands American Mortgage Bank is a holder in due course of the notes and mortgages sued on. It holds these notes to the extent of its interest therein. These notes are held as collateral security for the $12,000 note which is also secured by a direct mortgage upon 86 acres of land and 322 acres of land. We think it but just that the bank should foreclose the direct mortgages first, and then the interest of that bank in these notes will be the difference between what is realized on that foreclosure and what is due upon the

$12,000 note, the direct obligation of Forsyth to that bank. If there were no equities existing between these appellants and Forsyth, then we concede that the Netherlands American Mortgage Bank might proceed to enforce any of the securities as it saw fit; but where it is shown, as between the appellants here and Forsyth, that the notes given by these appellants to Forsyth were fraudulent notes, procured by misrepresentation, then the equities demand that these defrauded appellants should not be required to pay unless the innocent holder of the notes cannot satisfy its claim without requiring these appellants to pay. We are satisfied, for these reasons, that the trial court should have required the respondent bank to foreclose its mortgage upon the 86 acres and the 322 acres before entering judgment against these appellants.

The cause is, therefore, reversed and remanded with instructions to the lower court to require the respondent bank to proceed, by making new parties if necessary, against the land of Forsyth's estate in Grant county, and, after foreclosure and sale thereof, then to enter judgment against these appellants for the balance, whatever it may be, not to exceed the amount of the indebtedness as shown by their notes. It will not be necessary to retry this branch of the case in the court below. The costs of the trial in the lower court and the costs in this court will abide the result of the final foreclosure.

ELLIS, C. J., CHADWICK, MORRIS, and HOLCOMB, JJ., concur.