## DILWORTH *v.* FEDERAL RESERVE BANK OF ST. LOUIS.

(Division B.   October 30, 1933.)

[150 So. 821.   No. 30731.]

374

(In Banc. April 30, 1934.)

[154 So. 535. No. 30731.]

B. F. Worsham, of Corinth, for appellants.

**Lester G. Fant, Sr. & Jr.,** of Holly Springs, for appellee.

378

Argued orally by **B. F. Worsham**, for appellant, and by **L. G. Fant, Jr.**, for appellee.

**Ethridge, P. J.**, delivered the opinion of the court.

The Federal Reserve Bank of St. Louis, Mo., filed a suit against the appellant here, B. C. Dilworth, in the circuit court of Alcorn county, on a note dated October 30, 1931, due ninety days after date, payable to the First National Bank of Corinth, Miss., and bearing eight per cent. interest from date until paid, and agreement that, if not paid, any money on deposit to the credit of B. C. Dilworth on the books of the First National Bank of Corinth, Miss., should be applied, at once, on the payment of this note, with the usual stipulations as to attorney's fees, etc. After alleging the execution of the note, the appellee alleged that, before its maturity, the First National Bank of Corinth indorsed said note to the order of the Federal Reserve Bank of St. Louis for valuable consideration, in the ordinary course of business, which latter bank then became, and still is, the holder of said note.

The suit was filed on March 10, 1932, and on July 12 the appellant filed a motion to transfer the cause to the chancery court of the county of Alcorn, Miss., alleging, among other things, that, by the terms of the note itself, it was agreed that, if not paid at maturity, any and all money on deposit to his credit might be applied as a credit on or to the payment of said note; and that, when said note was transferred by the First National Bank of Corinth to the Federal Reserve Bank of St. Louis, he (Dilworth) had substantial credit in the First National Bank of Corinth, which was known to the appellee; that the note sued on in this cause does not belong to the appellee, but is held by it as collateral to an indebtedness of the First National Bank of Corinth to the appellee, and that, at best, appellee is only the pledgee of said note. It was further alleged that, when appellee took the note as security for said indebtedness, it made a thorough and detailed investigation, and knew that appellant had a substantial amount on deposit which could be, if the First National Bank of Corinth should fail, offset against the said note; and, with this information and knowledge, the appellee took the note as collateral security and was not without notice of such a defense. It was alleged that the collateral held by the Federal Reserve Bank of St. Louis for the indebtedness of the First National Bank of Corinth was two or three times the amount of its debt; that among the collateral held by appellee there were numerous county and municipal bonds, which appellee was under duty, when the First National Bank of Corinth became insolvent, to sell and apply the proceeds to the debt the First National Bank of Corinth owed it, and that it was the duty of appellee to sell said county and municipal bonds when their market value was eighty cents to ninety cents, which would have enabled the First National Bank to have

materially reduced its indebtedness to the Federal Reserve Bank, the appellee here. It was further alleged that it is generally understood that in the near future the First National Bank of Corinth will pay to its creditors seven and one-half per cent, or ten per cent in dividends, and that the appellee would receive, at least, twenty thousand dollars from such dividends, and that, if the appellee would sell the collateral and collect this dividend, there would be a sufficient amount to pay the obligations in full. It was further alleged that there were other notes pledged to the appellee to secure the debt of the First National Bank of Corinth to it, which notes had no offset against the First National Bank, and that the appellant had placed with the First National Bank as collateral security certain notes, and these notes had passed to the appellee being attached to notes of the appellant, and that appellee knew that the notes were collateral security, and that they should be applied to a reduction of appellant's note to the First National Bank of Corinth. It was further alleged that he had placed certain notes and deeds of trust with the First National Bank of Corinth, which it had agreed to take at their face value, and that said notes bore eight per cent interest, and were worth their face value; that the appellee knew these facts, and is charged with the knowledge thereof. It was further alleged that appellant does not know the exact amount due by the First National Bank of Corinth to the appellee, and does not know the exact amount in kind of the notes and assets which appellee has as collateral security, and that appellant would not be able to make his defenses in a court of law, but could only avail of them in a court of equity, and that, in order for him to avail himself of such defenses, it would be necessary for this cause to be transferred to the chancery court so that complete equity could be fully and fairly administered. He further alleged that on the 24th or 25th day

of December, 1930, the First National Bank of Corinth closed its doors, and that, for some time before this closing, the appellee had a representative at Corinth, the said Corinth bank being largely indebted to appellee, and that appellee was thoroughly and fully familiar with all the conditions of said bank, its collateral, and its value, etc.; that the appellee, through its representative, took a keen interest in said bank, as a result of which the First National Bank of Corinth reopened on January 24, 1931, and the people were urged to make deposits and do business therewith; that the appellant did not know the condition of said bank, but continued to do business with it; and that the appellee had superior knowledge of the condition of said bank, and actually knew the condition at all times from the temporary closing in 1930 until the bank was finally closed. It was further alleged that the appellant, along with other depositors, was constantly assured that the bank was fully solvent; that the appellee was conversant with every fact, and knew that the depositors having deposits in the First National Bank were entitled to offsets as against their debts to it. It was further alleged that the appellant is entitled to many equitable defenses, and that, in order to receive the benefit thereof, he is entitled to have the case removed to the chancery court.

. The motion to remove the cause to the chancery court was overruled, but the order overruling it does not appear to be dated.

Interrogatories were filed under Section 1551, Code Code 1930, seeking information of the appellee, a nonresident, as to many things pertaining to the business of such appellee and its transactions with the First National Bank of Corinth. These interrogatories were filed on January 23, 1933, and served on the attorney for the appellee on January 25, 1933, and on motion of the appellant were stricken out. Prior to the order striking

the interrogatories or refusing to compel the appellee to answer them, the pleas of appellant had been filed. The appellant pleaded the general issue, giving notice thereunder that he would prove on the trial that the appellee was not the holder of the notes acquired as collateral, but that same are the property of the First National Bank of Corinth; that said First National Bank of Corinth was and is indebted to the appellant in the sum of about one thousand four hundred dollars; that the appellee knew that the appellant was entitled to an offset against said note in a sufficient amount to discharge same; that the appellee had knowledge of all these facts during all the time complained of; that the appellant had delivered to the First National Bank of Corinth a note signed by H. B. Phifer and wife on which there was a balance due of about two thousand dollars, which note had been bought by the appellee, it having been sold with the understanding and agreement that it was to be applied on the note sued on and as payment to that extent; and that the appellee knew of said agreement. It was alleged that appellant would further show that a short time before the closing of the First National Bank of Corinth in November, 1931, he was indebted thereto in the sum of eight hundred dollars, and had pledged as security a note and trust deed executed by J. T. Ragan, and, a short time before the bank closed, he had paid said eight hundred dollar note, with the understanding on the part of the bank that it would send appellant the Ragan note and trust deed, which was worth its full face value; that the appellee knew about the said eight hundred dollar loan, and knew that the Ragan note was pledged as security therefor, and is the property of appellant, and that appellee took, retained, and converted to its own use the Ragan note, knowing full well that the First National Bank of Corinth had no lien, right, nor claim thereto.

As a second plea, it was alleged that the appellee did not acquire the note sued on in due course of business and with no notice of defects therein; that the note provides, among other things, that all money on deposit to the credit of the maker should be applied to its payment; that the appellant had on deposit, and still has, about one thousand four hundred dollars, which should be applied as payment on said note, or as a set-off, and that the appellee had full knowledge of this fact; that the note sued on is not the property of the appellee, but is merely held as collateral, and appellee is only the pledgee of said note. He further alleged that the appellee did not advance any specific amount on the note sued on, but that said note was one of many taken by appellee at the same time for its indebtedness, and that appellee still holds many of said notes as collateral for the balance due it by the First National Bank of Corinth, if anything, said collateral amounting to some two and one-half or three times the amount of the indebtedness of the bank to it. He further alleged that said First National Bank of Corinth was first closed on or about the 26th of December, 1930, as a result of a run thereon; that during the time of the run the appellee's representative emphatically and unconditionally assured the public that the First National Bank of Corinth was fully solvent and capable of meeting its obligations, when appellee then knew that said bank was insolvent, and incapable of meeting its obligations, because appellee had been furnished with the result of the examination. He further alleged that the appellee was instrumental in having the city of Corinth, Mississippi, sell and deliver to the First National Bank about one hundred forty thousand dollars of county, municipal, and district bonds, in order that the bank might use them as security for additional loans, and that appellee knew that said First National Bank did not pay the city of Corinth anything for said bonds. He fur-

ther alleged that during said time the First National Bank of Corinth was heavily indebted to the appellee in a sum in excess of two hundred thousand dollars, and that, when the bank reopened on January 24, 1931, and after said bonds had been sold, the appellee made no further advances to the First National Bank of Corinth, and yet required it to pledge with it, as additional security, and without any consideration therefor, that the reasons for said dealings were that the appellee knew that said First National Bank was insolvent, and that, if it reopened, appellee could get further security for its debt, and that it would profit directly by getting possession of said bonds as additional security. It was further alleged that the appellee, under the law, owed the duty to appellant, as well as to the First National Bank, to manage, handle, preserve and control, care for, and collect, the securities pledged to it by said First National Bank, and not to sacrifice and dispose of same; but that appellee is selling, disposing, and sacrificing the collateral in utter disregard of the rights and equities of appellant and other depositors of the First National Bank.

In the third plea, he set out the allegations with reference to the Phifer note referred to in the notice under the general issue plea.

In the fourth plea, he alleged that some weeks prior to the closing of the First National Bank of Corinth he borrowed from said bank eight hundred dollars, pledging with it as security the note of J. T. Ragan, payable to appellant, for one thousand five hundred dollars, secured by a trust deed on city property in Corinth, and there is still due one thousand five hundred dollars on said note, with interest, and there was no agreement or intimation, written or verbal, that said note was being pledged as security for any debt other than the eight hundred dollars; that he paid this eight hundred dollar note with interest, and was promised that the bank would mail the

note and deed of trust to him, but the bank failed to do so, and that the appellee took, held, and converted the said note and trust deed to its own use, without any legal or lawful right to take said Ragan note and convert it to its own use. Appellant asks in this plea for judgment against the appellee in his set-off and counterclaims for the difference between the values of the Phifer and Ragan notes, and the note sued on in this cause.

In the fifth plea the notes and deeds of trust from Phifer and Ragan were made exhibits thereto, and it was alleged that these were taken by appellee and converted to its use, and that appellee is indebted to the appellant for the full value of said notes with interest.

The appellee moved the court to strike from the files the plea entitled "Notice under General Issue," averring that it is not a plea of general issue, and that an attempt is made thereunder to set up a defense against the payee which is not a defense against the pledgee, and is also an attempt to alter a written contract by oral proof.

The appellee demurred to pleas Nos. 2, 3, 4, and 5, which demurrer was, by the court, sustained.

A motion to transfer a cause to another court must be made in the court below in order to give the court opportunity to transfer it. And, if the court refuses to transfer a cause, and correctly decides the lawsuit, and gives the parties their full rights under the law, we are powerless, under section 147 of the Constitution, to reverse the lower court. But, if other questions are considered, and substantial errors are made, we can reverse and remand a cause to the proper court, if necessary.

When the court overrules a motion to transfer, the parties themselves must then have formal pleadings setting up all rights existing under the law, and, if the court retains jurisdiction and administers justice according to the law, although the case may belong in another forum, the judgment will be affirmed here.

In the case before us, we think the pleas setting up equitable defenses were valid in two particulars: (1) An equitable right for discovery; and (2) an equitable right to a marshaling of its assets.

The allegations on the motion to transfer and also the special pleas showed that the appellee had ample security which had no offset against the First National Bank of Corinth, and that, if these had been resorted to and applied to the payment of appellee's debt, they would have discharged the liability, and therefore the appellee would have had no demand against the appellant.

The pleadings alleged that the notes were taken as collateral and were not purchased outright by the Federal Reserve Bank of St. Louis, for value, without notice of defects.

Where a creditor has a claim upon two funds, another having a claim to one of them may compel him to first go against that one to which the complainant has no claim. Davis v. Walker, 51 Miss. 659, and Millsaps v. Bond, 64 Miss. 453, 1 So. 506.

The marshaling of the assets of a debtor, and the fixing of the priorities of creditors, can only be accomplished in chancery. Johnson v. Moyse (Miss.), 12 So. 483, not reported [in State reports]; Cain v. Moyse, 71 Miss. 653, 15 So. 115.

The effect of section 147 of the Constitution is to give the circuit court power to administer equity in cases arising in that court, and, if the judge of the circuit court elects to do so, this court cannot reverse for that reason alone. But, of course, the Constitution does not intend that the circuit court should retain equitable cases, or that the chancery court should retain common-law cases, but only that the public may not suffer by a mistake of judgment as to whether the case is one for equity or common law. If the right result is reached, although the case was in the wrong court, the judgment will not be disturbed.

However, if there are causes independent of the jurisdiction, as to whether the case is an equitable or common-law case, and the party has been denied a legal right, or an equitable right, the judgment of the court will be reversed, and the case will be sent to the court which is best fitted to administer justice.

In Warner v. Hogin, 148 Miss. 562, 114 So. 347, 348, in the third syllabus, it is stated that a "cause cannot be reversed because of having been transferred to wrong court unless complaining party has been denied substantial right thereby." Constitution 1890, sec. 147. In the body of the opinion the court said: "The chancery court and the circuit court cannot make football of a case by kicking it back and forth from one to the other. Under our constitution and statutes, when one of these courts transfers a cause to the other, the court to which it is transferred has jurisdiction to finally dispose of the cause. When such a cause is appealed to the supreme court from either the chancery court or the circuit court, it cannot be reversed, under section 147 of the Constitution, on the ground alone of a mistake of jurisdiction; but if, in addition to that error, the complainant party is denied a substantial right on account of the cause being in the wrong court, the supreme court will reverse it and send it to the right court."

It was never intended by section 147 of the Constitution for one court to take and retain jurisdiction, and still deny a party his rights under the law. If he has equitable defenses of which he cannot avail himself in the circuit court, and moves to be transferred to the chancery court, the circuit court should transfer the cause, so that the party may have the benefit of his equitable defenses. The legal rights of a party are not to be sacrificed, because a court declines to administer the relief to which he is entitled.

The judgment will be reversed and the cause will be

remanded to the chancery court of Alcorn county, pleading to be made in conformity to equity practice.

Reversed and remanded to chancery court.

ON SUGGESTION OF ERROR.

**Ethridge, J.**, delivered the opinion of the court on suggestion of error.

This case was before the court heretofore, and was reversed and transferred to the chancery court. 150 So. 821. On a suggestion of error, some differences developed among the judges of Division B, and the cause was remanded to the court in banc, reargued before Division A, and has been considered by the full court. The pleadings in the case are very lengthy and it is difficult to state the facts in an abridged form. The rule in a case where demurrers have been sustained, and where pleadings have been stricken from the files, is to consider the allegations of the pleadings as true. The facts were stated in the original opinion, but we will restate them, with some modifications, in this opinion.

The Federal Bank of St. Louis, Missouri, filed a suit against B. C. Dilworth in the circuit court of Alcorn county on a note dated October 30, 1931, due ninety days after date, payable to the First National Bank of Corinth, Mississippi, bearing eight per cent interest from date until paid, and agreeing that if not paid, any money on deposit to the credit of B. C. Dilworth in the First National Bank of Corinth, Mississippi, might be applied, at once, on the payment of this note, with the usual stipulations as to attorney's fees, etc. After alleging the execution of the note, the appellee alleged that, before its maturity, the First National Bank of Corinth indorsed said note to the order of the Federal Reverse Bank of St. Louis for valuable consideration, in the ordinary

course of business, which latter bank then became, and still is, the holder of said note. The suit was filed on March 10, 1932, and on July 12 the appellant filed a motion to transfer the cause to the chancery court of Alcorn county, Mississippi, alleging, among other things, that by the terms of the note itself, it was agreed that, if not paid at maturity, any and all money on deposit to his credit might be applied as a credit on the payment of said notes and that when said note was transferred by the First National Bank of Corinth to the Federal Reserve Bank of St. Louis, he (Dilworth) had substantial credit in the First National Bank of Corinth, which was known to the appellee; that the note sued on in this case does not belong to the appellee, but is held by it as collateral to an indebtedness of the First National Bank of Corinth to the appellee; and that, at best, appellee is only the pledgee of said note. It was further alleged that, when appellee took the note as security for the said indebtedness, it made a thorough and detailed investigation, and knew that appellant had a substantial amount on deposit which could be, if the First National Bank of Corinth should fail, offset against the said note; and, with this information and knowledge, the appellee took the note as collateral security and was not without notice of such a defense. It was alleged that the collateral held by the Federal Reserve Bank of St. Louis for the indebtedness of the First National Bank of Corinth was two or three times the amount of its debt; that among the collateral held by appellee were numerous county and municipal bonds which appellee was under duty, when the First National Bank of Corinth became insolvent, to sell and apply the proceeds to the debt the First National Bank of Corinth owed it; and that it was appellee's duty to sell said bonds when their market value was eighty to ninety cents, which would have enabled the First National Bank to have materially reduced its indebtedness to the

Federal Reserve Bank. It was further alleged that it is generally understood that in the near future the First National Bank of Corinth will pay to its creditors seven and one-half per cent or ten per cent in dividends, and that the appellee would receive, at least, twenty thousand dollars from such dividends, and that if the appellee would sell the collateral and collect this dividend, there would be a sufficient amount to pay the obligations in full. It was further alleged that there were other notes pledged to the appellee to secure the debt of the First National Bank of Corinth to it, which notes had no offset against the First National Bank, and that the appellant had placed with the First National Bank as collateral security certain notes, and these notes had passed to appellee being attached to notes of the appellant, and that appellee knew that the notes were collateral security, and that they should be applied to a reduction of appellant's note due the First National Bank of Corinth. It was further alleged that he had placed certain notes and deeds of trust with the First National Bank of Corinth, which it had agreed to take at their face value, which notes bore eight per cent interest and were worth their face value; that the appellee knew these facts and is charged with the knowledge thereof. It is further alleged that appellant does not know the exact amount due by the First National Bank of Corinth to the appellee, and does not know the exact amount, in kind, of the notes and assets which appellee has as collateral security, and that appellant would not be able to make his defenses in a court of law, but could only avail of them in a court of equity, and in order to do so, it would be necessary for this cause to be transferred to the chancery court so complete equity can be fully and fairly administered. He further alleged that on the 24th or 25th day of December, 1930, the First National Bank of Corinth closed its doors, and that for some time before this closing, the appellee had a repre-

sentative at Corinth, and that appellee was thoroughly and fully familiar with all the conditions of said bank, its collateral, and its value, etc.; that appellee took a keen interest in said bank, as a result of which the First National Bank of Corinth reopened on January 24, 1931, and the people were urged to make deposits and do business therewith; that the appellant did not know the condition of said bank, and continued to do business with it; and that the appellee had superior knowledge of said bank, and actually knew the condition at all times from the temporary closing in 1930 until the bank was finally closed. It was further alleged that the appellant, along with other depositors, was constantly assured that the bank was fully solvent; that the appellee was conversant with every fact, and knew that the depositors were entitled to offsets as against their debts to it. It was further alleged that the appellant is entitled to many equitable defenses, and that, in order to receive the benefit thereof, he is entitled to have the case removed to the chancery court. It was alleged that the plaintiff held stock in the Federal Reserve Bank, pledged to the First National Bank, in the sum of several thousand dollars, which should have been sold and the proceeds applied on the debt due by the First National Bank of Corinth to the plaintiff. It was further alleged that to Dilworth was due the duty of having the collateral conserved and sold at the best possible price, and not sacrificed.

The motion to remove the cause to the chancery court was overruled, but the order so doing does not appear to be dated.

Interrogatories were filed under section 1551, Code 1930, seeking information of the appellee, a nonresident, as to many things pertaining to the business of such appellee and its transactions with the First National Bank of Corinth, on January 23, 1933, and served on the attorney for the appellee on January 25, 1933, which, on

motion of the appellant, were stricken out. Prior to the order striking the interrogatories, or refusing to compel the appellee to answer them, the pleas of appellant had been filed. The appellant pleaded the general issue giving notice thereunder that he would prove on the trial that the appellee was not the holder of the notes acquired as collateral, but that same are the property of the First National Bank of Corinth, which was indebted to the appellant in the sum of about one thousand four hundred dollars; that the appellee knew that the appellant·was entitled to an offset against said note in a sufficient amount to discharge same; that the appellee had knowledge of all these facts during all the time complained of; that the appellant had delivered to the First National Bank of Corinth a note signed by H. B. Phifer and wife on which there was a balance due of about two thousand dollars, which note had been bought by the appellee, having been sold with the understanding and agreement that it was to be applied on the note sued on as payment to that extent; and that the appellee knew of said agreement. It was alleged that appellant would further show that a short time before the closing of the First National Bank of Corinth in November, 1931, he was indebted thereto in the sum of eight hundred dollars, and had pledged as security a note and trust deed executed by J. T. Ragan, and, shortly before the bank closed, he had paid this eight hundred dollar note with the understanding that the bank would send him the Ragan note; that the appellee knew about the eight hundred dollar loan; and that the Ragan note was pledged as security therefor and is the property of appellant, but the appellee took, retained, and converted to its own use the Ragan note knowing full well that the First National Bank of Corinth had no lien, right, nor claim thereto.

As a second, special plea, it was alleged that the appellee did not acquire the note sued on in due course of

business, with no notice of any defects therein, since the note itself provides, among other things, that all money on deposit to the credit of the maker should be applied to its payment; that appellant had, and still has, on de-posit about one thousand four hundred dollars which should be applied as payment, or as a set-off, on said note, and that the appellee had full knowledge of this fact; that the note sued on is not the property of the ap-pellee, but is merely held as collateral, and appellee is only the pledgee of said note. He further alleged that the appellee did not advance any specific amount on the note sued on, but that said note was one of many taken by appellee at the same time for its indebtedness, and still holds many of said notes as collateral for the balance due it by the First National Bank of Corinth, said col-lateral amounting to some two or three times the amount of the indebtedness of the bank to it. He further al-leged that said First National Bank of Corinth was first closed on or about the 26th of December, 1930, as a result of a run thereon; that during the time of the run the ap-pellee's representative emphatically and unconditionally assured the public that the First National Bank of Cor-inth was fully solvent and capable of meeting its obliga-tions, when appellee then knew that said bank was in-solvent and incapable of meeting its obligations. He fur-ther alleged that the appellee was instrumental in having the city of Corinth, Mississippi, sell and deliver to the First National Bank of Corinth, Miss., about one hundred forty thousand dollars of county, municipal, and district bonds, that the bank might use them as security for ad-ditional loans, and that appellee knew that said First National Bank did not pay the city of Corinth anything for said bonds. He further alleged that during said time, the First National Bank of Corinth was heavily indebted to the appellee in a sum in excess of two hundred thou-sand dollars, and that, when the bank reopened on Jan-

uary 24, 1931, and after said bonds had been sold, the appellee made no further advances to the First National Bank of Corinth, and yet required it to pledge as additional security, and without any consideration therefor, collateral, for the reason that appellee knew that said First National Bank was insolvent, and if it reopened, appellee could get further security for its debt, and that it would profit directly by getting possession of said bonds as additional security. It was further alleged that the appellee under the law, owed the duty to appellant, as well as to the First National Bank, to manage, handle, preserve, control, care for, and collect the securities pledged to it by said First National Bank; but that appellee is selling, disposing, and sacrificing the collateral in utter disregard of the rights and equities of appellant and other depositors of the First National Bank.

In the third plea, he set out allegations with reference to the Phifer note referred to in the notice under the general issue plea.

In the fourth plea, he alleged that some weeks prior to the closing of the First National Bank of Corinth, as stated, he borrowed eight hundred dollars giving as collateral the note of J. T. Ragan for one thousand five hundred dollars secured by a trust deed on city property in Corinth, with no agreement or intimation that said note was being pledged as security for any other than the $800 note; that he paid this $800 note with interest, but the bank failed to send said Ragan note and trust deed to him; and that the appellee took, held, and converted said note to its own use, without any legal or lawful right. Appellant asked in this plea for judgment against the appellee for the difference between the value of the Phifer and Ragan notes, and the note sued on in this cause.

In the fifth plea, the Phifer and Ragan notes were filed as exhibits thereto, and it was alleged that the appellee

is indebted to the appellant for the full value of said notes with interest.

The appellee moved the court to strike the general issue plea, and the "Notice under General Issue" from the files, it being argued that it is not a plea of general issue, and that a defense is attempted to be set up thereunder against the payee, which is not a defense against the pledgee, and is an attempt to alter a written contract by oral proof.

The appellee demurred to pleas Nos. 2, 3, 4, and 5, which demurrer was sustained.

It is contended that the plea called a plea of the general issue filed by the appellant is not such a plea, and that non est factum was the proper plea of the general issue. The plea of general issue tendered by the appellant reads as follows: "Now comes the defendant by his attorney and defends the wrongs and injuries, when, etc., and says that he did not undertake and promise in the manner and form complained of on file in this cause and that he does not owe the note sued on, nor any part thereof, and of this the defendant puts himself upon the country."

We do not think non est factum is the proper plea of the general issue. Non est factum merely denies execution and the signature of the note. The plea involved puts in issue the validity of the note sued on. It does not, because of the statutory requirement to deny the signature under oath, put the plaintiff to proof of the signature. However, it does put in issue the right of the plaintiff to bring suit and recover the alleged debt alleged by the note. It was, therefore, error for the court to strike out the plea of the general issue and the notice of special matter thereunder, and, for this reason, it is necessary to reverse the judgment of the lower court and remand the cause for a new trial.

Section 147 of the Constitution provides that no judgment of any chancery or circuit court shall be reversed

on the ground of want of jurisdiction to render such decree or judgment; but if the Supreme Court shall find error in the proceedings other than jurisdiction, the Supreme Court may remand it to that court which, in its opinion, can best determine the controversy.

We are of opinion that the chancery court can better deal with and determine the controversy here than the circuit court.

As stated in the former opinion, a motion to transfer a cause from the circuit court to the chancery court, or vice versa, must be made in the court below in order to give the court opportunity to transfer it. And, if the court refuses to transfer a cause, and correctly decides a lawsuit, and gives the parties their full rights under the law, we are powerless, under section 147 of the Constitution, to reverse the lower court. But, if other questions are considered, and substantial errors are made. we can reverse and remand a cause to the proper court, when it is necessary.

It will be seen from the pleadings set out above that the security held by the Federal Reserve Bank is more than ample to secure the debt due by the First National Bank. It will also be seen from the allegations that the appellant did not have precise and accurate knowledge of the books of the bank and each piece of collateral pledged to secure the debt of the First National Bank of Corinth to the Federal Reserve Bank of St. Louis.

The interrogatories which were filed in the court below and stricken from the files were numerous, and they undertook to secure definite information from the plaintiff as to the transactions, how the collateral was evidenced, and what disposition was being made of this collateral. It was stated in the motion to strike the interrogatories that they would have been answered but for the disturbed condition in Memphis where the collateral was held by the Federal Reserve Bank Branch.

Under the allegations of the motion to transfer and the special pleas filed by the defendant, a discovery was proper. It might be that had the interrogatories been answered they would have furnished the information required for a proper determination of the issues in the suit. It will also be noted from the pleas and the motion to transfer the cause, that it was alleged that the Federal Reserve Bank was under duty to conserve the collateral which it held as security for the debt due it by the First National Bank of Corinth, and that it was not handling said collateral in a proper and prudent manner in accordance with its duty, but was ruthlessly sacrificing the collateral and endangering the rights of the defendant.

We think, under the facts in this record, alleged in the pleas, which must be treated as true for the purpose of this decision, that the chancery court could best determine this cause. We are also of the opinion that, on the pleadings, equity, good conscience, and fair dealing require the appellee to first resort to the collateral against which no defenses exist against the First National Bank of Corinth, before resorting to the note and collateral thereto turned over to the First National Bank and by it turned over as collateral to the Federal Reserve Bank.

We see no reason why the principle of marshaling assets should not be applied here, in view of the various pleadings. It is true that, if the plaintiff was a bona fide holder, for value, in due course, before maturity of the note, marshaling will not be applied, if it tends to work an inequity or injustice to plaintiff.

The appellant and the appellee were creditors of the First National Bank of Corinth, and according to the allegations of the pleadings, the appellee had ample security, not subject to offset, to pay the debt owed it by the First National Bank of Corinth. The general rule is that

where a creditor has a claim upon two funds, and another has a claim upon one of the funds only, the one having a claim to two funds may be compelled to go against the one to which he has an exclusive right, leaving the other to a creditor who can resort to it alone. Davis v. Walker, 51 Miss. 659; Millsaps v. Bond, 64 Miss. 453, 1 So. 506; Aron v. Chaffe et al., 72 Miss. 159, 17 So. 11. This last case is very much like the one before us. It was there held that, where one gave his notes to another who transferred them to a third party, and failed and made an assignment, which assignment was attacked, and it was prayed that there might be a marshaling of the assets and securities, and that the defendants be required to exhaust their remedy against the principal debtor before pursuing the complainant, in order that he might establish an offset against the insolvent payee, although it appeared that he was justly indebted on said notes in more than the amount decreed in favor of the defendants, it was error to dissolve the injunction and award damages.

It is argued by the appellee here that the defendant cannot marshal the securities under the decision in Sowell v. Federal Reserve Bank of Dallas, 268 U. S. 449, 45 S. Ct. 528, 530, 69 L. Ed. 1041, where it was held that marshaling would not be applied. However, the Supreme Court of the United States, in that case said: "Had plaintiff in error set up any defense to the note, good as to the payee, such as fraud, or failure of consideration, he might, under the law of some jurisdictions, have urged such cases as McBride v. Potter, 169 Mass. 7, 61 Am. St. Rep. 265, 47 N. E. 242, or Second Nat. Bank v. McGehee (Tex. Civ. App.), 241 S. W. 287, or Van Winkle Gin & Machinery Co. v. Citizens' Bank, 89 Tex. 147, 33 S. W. 862, as a basis for the claim that because of his special equities, affecting the inception of the note, the defendant in error

should exonerate him by resorting to the other collateral, if shown to be sufficient to pay the note."

In the case before us, the allegations of the pleadings, if true, present a case of fraud on the part of the plaintiff. It is alleged that while the First National Bank of Corinth was largely indebted to it, and was, in fact, insolvent, and a run had begun on it by its depositors, an agent of the Federal Reserve Bank was in the bank and knew its condition, and yet represented to the public that it was perfectly solvent and urged that they not withdraw. their deposits, and represented that said Federal Reserve Bank was behind the First National Bank of Corinth. That, by means of such representations, the Corinth bank reopened, and the people had confidence in it, and the appellant here, not knowing its insolvent condition, continued to do business with it after its reopening, and executed the note in question shortly before it closed permanently.

It was further alleged that the plaintiff, the Federal Reserve Bank, after getting the First National Bank of Corinth to reopen, having full knowledge of the condition, and without advancing any more capital, got all the securities and assets of the First National Bank of Corinth to further secure its debt to the Federal Reserve Bank.

The facts, as pleaded, show strongly fraud on the part of the Federal Reserve Bank, and if these facts be true, it was highly inequitable to permit the plaintiff to get the advantage of other parties in such transactions.

We believe the doctrine of marshaling can be applied here, even though the plaintiff, Federal Reserve Bank, was the purchaser, in good faith, for value, before maturity. The doctrine of marshaling is a benevolent doctrine of equity, and contributes to fair dealing and common honesty. In 38 C. J., p. 1365, it is stated that: "The doc-

trine of marshaling assets and securities is that, where a creditor has a lien on two funds in the hands of the same debtor, and another creditor has a lien on one of them only, equity, on the application of the latter, will compel the former to make his debt out of that fund to which the latter can not resort.''

On page 1367 of the same volume, it is further said that: ''The right to marshal assets is governed by equitable principles, the doctrine applying only when it can be done with justice to the creditor and his debtor, and without prejudice to third persons. . . . While the doctrine of marshaling assets or securities should be applied wherever available, it being an equitable doctrine not founded on contract, the right to marshal is a mere equity, its enforcement is governed by principles of equity called into action by the benevolence of the court in the sound judicial discretion of the court. This doctrine cannot be invoked when its operation will accomplish inequity. It applies only when it can be done with justice both to the creditor and to his debtor.''

In Stowe et al. v. Powers, 19 Wyo. 291, 116 P. 576, 579, it was said that: ''The equitable remedy of marshaling securities . . . 'depends upon the principle that a person having two funds to satisfy his demands shall not, by his election, disappoint a party having but one fund. The general rule is that if one creditor by virtue of a lien or interest can resort to two funds, and another to one of them only—as . . . where a mortgagee holds a prior mortgage on two parcels of land and a subsequent mortgage on but one of the parcels is given to another—the former must seek satisfaction out of that fund which the latter cannot touch.' ''

The same principles are announced in Live Stock State Bank v. Locke (Tex. Civ. App.), 277 S. W. 405; Van Winkle Gin & Mach. Co. v. Citizens' Bank, 89 Tex. 147, 33 S.

W. 862; Goodwin v. Mass. Loan & Trust Co., 152 Mass. 189, 25 N. E. 100; Citizens' Bank v. Waddy, 126 Ky. 169, 103, S. W. 249, 11 L. R. A. (N. S.) 598, 128 Am. St. Rep. 282; Netherlands Am. Mortgage Bank v. Grafke, 100 Wash. 188, 170 P. 876; Gotzian & Co. v. Shakman, 89 Wis. 52, 61 N. W. 304, 46 Am. St. Rep. 820; Bass v. Estill, 50 Miss. 300; Moorman v. Board of Sup'rs of Campbell County, 121 Va. 112, 92 S. E. 833, 2 A. L. R. 177; Ellis v. Temple, 4 Cold. 315, 94 Am. Dec. 200.

In some of the cases cited the equitable principles do not involve marshaling, but the kindred doctrine of contribution is treated of therein.

On the facts alleged in the case at bar, we think the defendant is entitled to his equities, and the judgment of the court below is, therefore, reversed, and the cause remanded to the chancery court for a new trial.

Reversed and remanded.

**Griffith, J.**, delivered a dissenting opinion.

If the opinion in chief in this case had rested entirely upon its main feature, namely, that the Federal Reserve Bank, under the present facts before us, was not a purchaser in good faith, for value, before maturity, I might have been in accord with the holding of the court; but from that part of the opinion which seems to go further and to say that, even if a purchaser in good faith, for value, before maturity, the doctrine of marshaling of assets may be enforced by its debtor against such a purchaser, I dissent.

The doctrine of marshaling is well settled and is well understood; it has its application when there are two creditors of a common debtor and when there is no other relation between the two creditors; but the great weight of authority is that a debtor cannot force his creditor to

postpone the claim of the latter against him under that doctrine. It was distinctly so held in Sowell v. Federal Reserve Bank, 268 U. S. 449, 45 S. Ct. 528, 69 L. Ed. 1041, and this is in accord with the cases everywhere, as stated in the note to that case, that "a pledgee of commercial paper cannot be compelled to resort first to other collateral in order to save equitable rights of the maker against the pledgor." The case, Aron v. Chaffe, 72 Miss. 159, page 165, 17 So. 11, relied on by the majority, recognizes the correct doctrine, and there stated that the holders of the notes could have proceeded to judgments at law had they so desired and had moved accordingly.

And not only is the holding of the Federal Supreme Court sound upon principle and in accord with the great weight of authority, for which reasons it ought to be followed, but there is a further reason: Our state has been committed by its Legislature to the public policy of uniformity in respect to the law of negotiable instruments, and in order to promote that policy we should follow the decisions of the Supreme Court of the United States on new questions of commercial law, as a common standard. See the cases cited, 15 C. J., p. 930, note 75. The federal reserve banks may sue in the Federal District Courts as well as in the state courts, Sowell v. Federal Reserve Bank, supra; so that if this court is to finally give adherence to the extreme view above noted, we will have produced a situation where if the case be in the Federal District Court a certain decision will be reached, whereas if in the state district court a different decision on exactly the same facts will be rendered. Naturally and justly, the world of commerce and of legitimate business will neither understand nor appreciate such a situation, and in cases such as this, where uniformity is so much to be desired, no court should, by following the line of a distinct minority in cases, deliberately bring

about such a conflict of judicial results upon the same facts in the same geographical territory.

**Smith, C. J.,** joins in this dissent.